## THE BRANTFORD CITY, etc.

### HATHAWAY and another *v.* THE BRANTFORD CITY, etc.

*(District Court, S. D. New York. December 2, 1886.)*

1. CARRIERS—BY SEA—BILL OF LADING—STIPULATIONS EXEMPTING FROM NEGLIGENCE—FOREIGN SHIPS—CONFLICT OF LAWS—LAW OF THE FLAG.
   The federal law of this country, by which stipulations of a common carrier exempting him from the consequences of his own negligence are held to be extorted without any real assent of the shipper, and to be against public

policy, and void, is controlling in suits brought here upon shipments made here on board foreign ships, under bills of lading signed by foreign masters, though such stipulations be valid by the law of the ship's flag.

2. CONFLICT OF LAWS—LAW OF THE FLAG—COMITY.

The "law of the flag," so called, expresses no principle of construction. So far as it differs from the general maritime law, it is but the mere municipal law of the ship's home, and has no authority abroad, except by comity, and will not be adopted in a different forum when against the policy, or prejudicial to the citizens, of the country of the forum.

3. SAME—INTENTION OF PARTIES—TORTS.

Independently of the intent of the parties, the law of the flag has no application to cases of tort, as between ships or persons of different nationalities and conflicting laws; and as a matter of contract, under the bill of lading, no intent to be governed by the law of the ship's flag, as respects acts of negligence committed in this country, or on the high seas, is to be reasonably inferred from the mere fact of shipment here in a foreign bottom.

4. SAME—SHIP SUPPLIES—MASTER'S POWERS—PERSONAL LIABILITY OF OWNERS.

Whether the mere municipal law of the ship's home contrary to the general maritime law should be held, in foreign forums, to limit the master's ordinary authority, under the general maritime law, to bind the ship in ordinary maritime contracts, as distinguished from an unlimited personal liability of the owners, to the prejudice of foreign citizens in dealing with a ship in their own ports, upon the faith of the ordinary maritime law, *quære. Semble,* the decisions in respect to maritime liens for supplies indicate the contrary.

5. CARRIERS—BY SEA—LIMITATION OF LIABILITY—"PERILS OF THE SEAS ARISING FROM NEGLIGENCE"—CATTLE FITTINGS—IMPRUDENT NAVIGATION—EVIDENCE—CONFLICT OF LAWS—LEX FORI.

The libelants, at Boston, shipped on board the British steamer B. C. 260 cattle, to be carried to Deptford, England, pursuant to a previous contract made in Boston with the resident agent of the line. The bill of lading, delivered shortly after the ship sailed, excepted "death, however caused," and loss from "stowage, or from perils of the sea, arising from negligence." Negligence was found by the court as respects the cattle fittings prepared at Boston, the stowage there, and navigation on the high seas, in consequence of which, in a storm of no unusual severity on the day after the steamer sailed, upon a lurch of the ship, the cattle fittings gave way, the cattle were thrown in heaps to leeward, and the vessel thrown nearly upon her beam ends, through which 93 per cent. of the cattle died, and were cast overboard before they reached England. *Held,* (1) that the loss arose by negligence of the ship; (2) that the insufficiency of the cattle fittings was a breach of her implied warranty that the ship should be fit for the voyage, and for the cargo, and not covered by the exceptions of the bill of lading; (3) that the stipulation as respects negligent stowage and negligent navigation was invalid in our courts, whether the case were viewed as a case of tort, or as a case of the proper construction of the contract in a conflict of laws; and (4) that the law of the flag—that is, the law of England—which upholds such stipulations was not controlling, (*a*) because there was no sufficient evidence that the parties intended a purely English contract; (*b*) because such stipulations were deemed by our law extorted, and, being without the assent necessary to prove a legal contract, the alleged contract, *pro tanto,* was not proved, as a matter of evidence, according to the law of the forum; and (*c*) because our national policy, which disallows such stipulations in favor of our own carriers, cannot permit the adoption of the foreign law, in favor of foreign carriers, by comity.

In Admiralty.

*North, Ward & Wagstaff* and *Henry M. Rogers,* for libelants.
*Wheeler & Cortis,* for claimants.

BROWN, J. The libel in this case was filed to recover $40,000, damages for the loss of 234 cattle on a voyage from Boston to West Hartlepool, England. The proofs show that in October, 1880, the libelants made a contract at Boston with Brigham & Co., the local agents of the

British steam-ship Brantford City, by the terms of which the libelants were to ship at Boston "from 250 to 300 head of cattle, as may be needed and demanded by the agents of the steamer; freight to be 85 shillings sterling per head, said cattle to be landed at Deptford, England." On the twenty-ninth of October, 260 head were accordingly shipped on board, and bills of lading were given therefor, which contained the following exceptions:

"Loss or damage resulting from  *  *  *  stowage,  *  *  *  or from any of the following perils, (whether arising from the negligence, default, or error in judgment of the master, mariners, engineers, or others of the crew, or otherwise, howsoever,) excepted, namely: Risk of craft, explosion, or fire at sea in craft, or on shore; boilers, steam, or machinery, or from the consequence of any damage or injury thereto, howsoever such damage or injury may be caused; collision, stranding, or other perils of the seas, rivers, or navigation, of whatever nature or kind soever, and howsoever such collision, stranding, or other peril may be caused.  *  *  *  Not accountable for death, loss, or injury, howsoever occasioned. Weights, contents, and value unknown, and not answerable for leakage or breakage."

The vessel sailed on October 30th; arrived in England on the sixteenth of November; and delivered only 26 of the 260 head that were taken on board. The rest had died, and been thrown overboard, during the voyage.

The libelants allege that the loss of the cattle was occasioned through the negligence of the defendants in the following particulars: *First*, that the steam-ship was improperly stowed, so as to be unseaworthy when she sailed, having a list to port, and being down by the head; *second*, that the fittings for the cattle were insufficient and improper, the head-boards being weak and insecurely fastened, and the cleats on the floor insufficient to prevent the cattle from slipping; *third*, that the ventilation was insufficient; and, *fourth*, that the navigation was unskillful and negligent.

The claimants deny any negligence; they also set up the stipulations of the bill of lading as a further defense, in case any negligence is established; and they further plead in their answer to the libel that these stipulations are valid by the British law, and that that law governs this case.

The evidence shows that on Sunday, the second day out, the ship met a gale from the S. S. E., with cross-seas. The log of that day reads as follows:

"This day commenced with strong wind S. S. E., and showers of rain. 4 A. M. Strong gale, and heavy rain. 8 A. M. Strong gale, with rain and heavy sea, shipping large quantities of water. Noon. Wind and weather do. P. M. Very heavy cross-sea; ship rolling very heavily. Put ship's head to sea, and eased the engines. 4 P. M. Wind veering to the S. W., with heavy squalls. 6 P. M. Ship took a very heavy lurch to port, breaking cattle fittings, and throwing the cattle to leeward. Employed all hands righting the cattle. Midnight. Sea decreasing, with moderate S. W. wind. Kept ship her course, full speed."

The testimony shows that the weather was moderate during the rest of the voyage, except on the 4th and 5th, when there was again much

rolling, with further injury to the cattle; but that, as a whole, the passage was not one of any unusual severity for that season of the year.

The steamer was 290 feet long over all, 36 feet beam amid-ships, and her mean draft on this voyage 20 feet 4 inches. Her gross tonnage was 2,371 tons. In her lower hold she carried 1,447 tons of grain and other cargo. On her three decks above she carried, in all, 509 cattle, weighing about 351 tons. The cattle were put in pens or stalls on each side of and facing a central passage-way running fore and aft, each pen holding from four to six cattle. The cattle were tied to head-boards secured to the stanchions. On the lower or orlop deck were 203 cattle, weighing about 140 tons; on the upper 'tween decks, 210 cattle, or about 145 tons; and on the spar deck, 96 cattle, weighing about 67 tons.

The evidence shows that by the heavy lurch to port on the thirty-first of October, above referred to, the steamer was thrown nearly upon her beam-ends, and so continued for a considerable time; that the cattle on all the three decks were hurled to the port side of the ship, breaking through, and carrying away the head-boards on each side, and lay in heaps until extricated during the following night. Some had their limbs broken. In others, their horns were broken and bleeding. Nearly all were more or less crushed, and suffered from the weight of the heaps in which they lay. By this misfortune the courage and spirits of the cattle were broken. Some were so badly injured that they died very shortly after. Some others could not be kept on their feet at all, and the rest only with difficulty. They would not take necessary food or drink. All became more or less overheated and fevered, and they died rapidly, from day to day. Scarcely a day passed that many carcases were not thrown overboard. Moreover, the difficulty and delay in removing the swelling and decaying bodies of the dead, in the feverish air of the ill-ventilated lower decks, increased the misery of the situation, and made existence there scarcely endurable to the attendants. The 26 cattle that alone remained alive were landed in England on the sixteenth of November, much damaged.

Besides the libelants' cattle, 249 others were shipped upon the same trip by one Osborne. A still larger loss proportionately occurred in his shipment, only seven being landed alive. This circumstance leads me to the conclusion, with the other evidence, that the loss of the libelants' cattle is not attributable to their weakness through previous transportation without a sufficient period of rest, as averred in the answer.

A large amount of testimony has been taken, and the case has been argued with the most painstaking thoroughness. Upon the best consideration that I have been able to give to it, in all its aspects, I am satisfied that, whatever faults may be attributable to the ship in respect to her stowage and fittings, the lurch on the evening of the thirty-first of October was the immediate cause of the loss that ensued. Without that, all the other causes combined would, I think, have had comparatively small effect, if any, in producing death of the cattle. This lurch was, doubtless, one of the perils of the sea, provided it was the unavoidable result of the wave that struck the ship at that time; and also pro-

vided the ship was navigated with all reasonable prudence and skill to avoid the effect of such waves, having reference to the nature of the cargo. But as all of the cargo above the hold consisted of live-stock, if the cattle fixtures and fastenings were not secure and adequate, or if the foothold furnished the cattle was insufficient, the moment these should give way, from some lurch a little greater than usual, the whole weight of live-stock, amounting to 351 tons, would constitute a suddenly shifting cargo, going over to leeward, as happened in this case; so that what might otherwise have been only a little greater lurch than usual, doing no injury, would result, through this shifting of the live-stock cargo, in throwing the vessel upon her beam ends.

The question to be determined here is whether the vessel's being thrown nearly upon her beam ends can be fairly attributed to a peril of the sea alone, or whether there existed such faults in the navigation of the ship, or in the stowage of the cargo, or in the fittings for the cattle, as were the necessary conditions without which this lurch, to the extent that it reached, and its consequent disaster, would not have occurred. If the latter is the fact, then the loss is not to be deemed a mere peril of the sea, but a result of the ship's negligence, (*Transportation Co.* v. *Downer*, 11 Wall. 129,) or, as the bill of lading has it, a "peril of the seas arising from negligence."

The loss in this case was not only unusual and extraordinary, but unparalleled. No other similar misfortune in the transportation of cattle is reported. The proof shows that cattle shipped on other vessels, at about the same time that the Brantford City sailed, met either with no loss, or with very slight loss. During the last three months of that year, from October to December, upon many voyages on which cattle were carried, none were lost. One of the claimants' witnesses says that, out of 7,000 cattle shipped during the year, only 40 were lost, or about one-half of 1 per cent.; another witness that, out of 4,500 head, only 4 were lost. The Brantford City, on her two previous voyages, lost but two or three cattle. On the present voyage, out of 509 taken on board, 476 cattle, or 93 per cent., were lost.

That a cattle ship like the Brantford City should be thrown upon her beam ends, or nearly so, is as extraordinary as the nearly total loss of the cattle on board. Upon repeated consideration of all the testimony, I find it impossible to become satisfied that this heavy lurch is reasonably to be accounted for by anything in the weather, the sea, or other circumstances, had the usual and reasonable skill and precautions been observed in the fittings, the stowage, and the navigation of the ship. The evidence, as I have said, does not indicate anything unusual for that season, either in the wind or sea, in the storm of the 31st. Nothing of any account was carried away on deck; and, though the hatches were left off up to that time, little, if any, water was taken in below. The log, indeed, reads: "P. M. Very heavy cross-sea, ship rolling very heavily. Put ship's head to sea, and eased the engines. 4 P. M. Wind veered to S. W., with heavy squalls." But the stowage of 1,447 tons of cargo in the lower hold, with only 351 tons on the three decks above, be-

sides the hay and water-tanks, was calculated to make her center of gravity low, and her rolling greater than if more weight of cargo had been stowed above the hold. But, however great the rolling actually was on the 31st, it was not such as to do any harm until two hours after the wind had veered to the S. W., when, at 6 P. M., the heavy lurch occurred, without any further explanation of its cause in the log. The testimony on the part of the claimants affords no additional explanation, except that a heavy wave struck the ship upon her starboard bow. But, as I have said, it also appears that no considerable water was taken aboard by it, none went down the open hatches, and no damage was done on deck. The third officer testified that he was on the dog watch from 4 to 6 P. M., and that "there was not a great deal of sea;" but, before he left, a "very heavy sea struck her starboard bow, and made her keel right over to port." "The ship," he says, "was exactly on her course."

A steamer of the size of the Brantford City· is not thrown upon her beam ends, even by a heavy sea, when heading the sea, or when meeting it at a reasonable angle, but only when the seas approach more from abeam. Considering the heavy weight of live cargo on board, it was the undoubted duty of the commander, in any considerable sea, to head towards it for the purpose of easing the ship, and thus to avoid the dangers incident to excessive rolling. The log states that the commander did head to the sea. But the time of doing so is not stated, although, from the form of the entry in the log, the ordinary inference would be that it was done at 12 o'clock noon, or very soon thereafter. But there is no statement that this heading to the sea was continued after the wind veered to the S. W., while the cross-sea, and the effect of the wave referred to, apparently giving the ship an impetus to leeward greater than had been experienced before, would indicate that no such further change was made; and the third officer confirms this inference, even if any change at all was made before 6 P. M.

There is strong ground for suspicion that the entries in the log in respect to what was done in the afternoon are misleading, and that the ship's head was not put to sea at all until after the lurch. The speed of the ship was not sufficient, nor was her position at noon of the next day, as given by the log, such as to make it seemingly credible that the ship was put head to the sea at or about noon of the 31st, as would naturally be inferred from the reading of the log. During the 24 hours the distance made, and the positions of the ship in latitude and longitude as indicated by the other entries in the log, are incompatible with the steamer's having been headed to the sea, i. e., S. S. E., during most of the afternoon of the 31st. The third officer, as above stated, testified that the ship, at the time of the lurch, was exactly on her course, and that there was not a great deal of sea. Moreover, Williams, who was in charge of the cattle, in his memorandum written the next day, put down 5 o'clock in the evening as the time when the storm arose. The engineer testifies that it was between 7 and 8 in the evening when the engines were eased; that is, after the lurch. For the claimants it is suggested that this is a mere error of the engineer as to time; but the engineer's log, which

should have shown the correct time, is not produced, nor is its absence accounted for.

From the circumstances above referred to, it is quite possible that neither the storm nor the sea were such as to have clearly required the steamer to be put head to the sea before 6 P. M., had she been in perfect trim, and her stowage favorable. But she had a list to port on leaving Boston, variously estimated from a foot and a half to two or three inches only. She was down a foot by the head, instead of being somewhat by the stern, as she ought to have been; and her stowage brought her center of gravity so low as to induce more rolling than usual or prudent. All the testimony shows that she rolled heavily. Her navigation should have been accommodated to these unfavorable conditions to a greater degree than, in my judgment, was done. In addition to this, I am also satisfied from the evidence that there was a parsimony in the preparation of the fittings,—the head-boards, floorings, and cleats for the cattle,—in consequence of which they were neither sufficient nor secure enough for a voyage at that season. In my judgment, it was from the effects of all these causes combined that a lurch a little heavier than usual, in a storm of no extraordinary character, resulted in throwing the vessel nearly upon her beam ends, and in the destruction of the cattle that followed.

It would not be profitable to discuss the details of the voluminous evidence in regard to the fittings, or other condition of the vessel on leaving port. As to some particulars, there is great diversity in the proofs; and as to others, the facts are not entirely clear. For the defense it is urged, particularly as respects the fittings, that they were subjected to the inspection of the libelants' agents, and of the agents of the insurers, and that both substantially approved of everything that was done. The evidence does not, to my mind, sustain this contention. Some complaint was certainly made, both as to stowage and as to the insufficiency of the fittings. One of the witnesses testified that, on complaint to the chief agent of the line that the fittings were insufficient, the latter replied that the captain and owners were grumbling about expenses; and he did not know whether he could get anything done or not; that he wanted to keep the expenses down, and had great difficulty in getting the captain's and the owners' consent. Had these fittings been built with such substantial strength and security as experience, up to that time, had shown to be necessary, in the judgment of persons versed in that business, I should not regard the vessel as in fault simply because they subsequently proved to be insufficient. *The Titania*, 19 Fed. Rep. 101; *The J. C. Stevenson*, 17 Fed. Rep. 540. But, upon the evidence, I cannot find that these fittings meet that test. On the contrary, I think that they were not such as the current knowledge and experience at that date-had shown to be reasonably required for a voyage at that season; the proof of which is found in the complaints on this subject made at the time, and in the evidence as to the character of the fittings, and their subsequent giving way.

The evidence as to the flooring is somewhat contradictory. It may have been laid differently in different places. A good deal of evidence

given by the libelants tends to show that it was simply boards or planks, laid upon the iron deck, and affording no sufficient hold for the cleats nailed into it. In one place the cleats could be kicked off with the boot. Much of the material for all the fittings was old, pieced, and spliced, after use on two prior voyages, instead of being new. Several of the libelants' witnesses say it was rotten, warped, and, in general, unfit. The testimony of the claimants' witnesses on this point is, in the main, in general terms only, affirming its good quality and sufficiency; and the captain so testifies as to all the details. But the testimony of those who did the work is the less satisfactory from the lack of any clear recollection on definite points of detail, partly, perhaps, the natural result of the lapse of time. But some of them say that they speak only from their general habit of doing such work, and their belief that this work was done well, and in the usual way. In this state of the evidence, the proof that all the head-boards gave way upon this lurch of the ship, in a storm of no extraordinary character, points indubitably, as it seems to me, to the insufficiency of the head-boards, cleats, and flooring as one of the causes of the disaster.

In the case of *The J. C. Stevenson*, 17 Fed. Rep. 540, the proofs, as respects nearly all the important facts, appear to have been wholly different from the proofs in the present case.

Whether the grain cargo shifted, or did not shift, during the voyage, is also a controverted question. It is not very material, except as evidence in regard to the degree of care used in stowage. The evidence for the claimants is very positive that there was no shifting of the grain. The evidence from the libelants' witnesses is equally positive to the contrary, and is sustained by the contemporaneous memorandums of Williams. It seems to be further sustained, also, by the local deviations of the compass, as recorded in the log, which are difficult to be accounted for in any other way than through a decided list to starboard after November 5th.

Without dwelling further upon these details, I must find, upon the evidence, that the vessel, while not chargeable in any one particular with a very palpable or very gross departure from the requirements of prudence, is nevertheless chargeable with such departures from the customary and safe course, in several important particulars, as to indicate a general disregard of the reasonable and necessary conditions of safety for such a cargo; and that these various departures constitute negligence in the discharge of her duty, which, combined, must be held to be the cause of the disaster. Her starting with a list to port; her being down, by a foot, at the head; the large quantity of hay over the sheds on her spar-deck; her stowage so low as to cause unusual rolling; her fittings, to a considerable extent of old materials, more or less patched up; and the flooring and cleats imperfect, and insecurely laid,—are all evidences of a general indifference to the conditions of assured safety for a cargo of live-stock; and, unless the incompatibilities in the statements in the log, and their inconsistencies with the testimony, can be reconciled in some way that I have not been able to discover, the further inference is

also unavoidable that, until after the disastrous lurch, the ship was not navigated so much with reference to the safety of her cargo of live-stock as to the speedy accomplishment of her voyage. If all these acts were done under a supposed exemption from liability for negligence, under the terms of the bill of lading and the English law, this tendency to subordinate, if not to sacrifice, the interests of the cargo to the supposed interests of the ship, would be to some extent explained; and the wisdom and the necessity of the law of the federal courts of this country, as respects liability for negligence, would be both illustrated and vindicated by the results of this voyage.

2. The defendants contend, however, that, inasmuch as the cargo was taken on board of a British ship, and as the bill of lading was signed by a British master, for transportation to England, the stipulations of the bill of lading exempting the ship from liability for negligence, and from loss by death, however occasioned, afford a complete defense; because such stipulations are valid by the law of England, (*Carr* v. *Lancashire & Y. Ry. Co.*, 7 Exch. 711; *Chartered Mercantile Bank of India* v. *Netherlands India Steam Nav. Co.*, 9 Q. B. Div. 118, 122; S. C. 10 Q. B. Div. 521, 532; *Steel* v. *State Line Co.*, 3 App. Cas. 88; *The Regulus*, 18 Fed. Rep. 380; S. C. 23 Fed. Rep. 98,) and because the English law, as it is claimed, is controlling in this case as the "law of the flag."

Notwithstanding the considerable time during which similar stipulations have been in use by most of the English lines of steamers, no case, so far as I am aware, has expressly adjudicated whether the English law or the American law should be deemed controlling. The cases most nearly approaching this are those of *The Montana*, 17 Fed. Rep. 377, S. C. 22 Fed. Rep. 716, and *The Oranmore*, 24 Fed. Rep. 922. In the latter there was an express stipulation that any question arising under the bill of lading should be determined by the English law. In the former case, the answer alleged exemption from liability by the provisions of the bill of lading; but it did not set up the defense that the case was subject to the English law, or that the English law, as respects the validity of stipulations against negligence, was different from our own. The failure to plead this defense was held to exclude it, both in the original decision and upon the appeal. 22 Fed. Rep. 716–728. After the decision on appeal, upon a petition for leave to amend the answer by setting up this defense, the petition was held to come too late, under the rules. Id. 730. In the present case the defense is specifically pleaded, and the validity of the stipulations for exemption from liability for negligence under the British law, as shown in the cases above cited, was admitted at the hearing.

The neglect to supply adequate fittings for the cattle, such as stanchions, head-boards, and flooring with secure cleats for proper foot-hold, etc., was negligence arising before the cattle were shipped, and before the voyage was commenced. The exceptions in the bill of lading, carefully scrutinized, will be found not to include any exemption from negligence in these particulars. There was no express warranty in this bill of lading that the ship was seaworthy; but in every such contract there

is an implied warranty that the ship shall be reasonably fit for the voyage, and for the particular service for which she is engaged. The neglect to fulfill this preliminary obligation has been held not covered by the ordinary exceptions as to negligence. *Steel* v. *State Line S. S. Co.*, 3 App. Cas. 72, 86; *Kopitoff* v. *Wilson*, 1 Q. B. Div. 377; *The Hadji*, 16 Fed. Rep. 861, 864; *Tattersall* v. *National S. S. Co.*, 12 Q. B. Div. 297. In the first case cited a defective fastening of the orlop port-hole before the ship sailed, if such as to make the vessel unseaworthy, was held not covered by the exceptions, because not arising upon the voyage. In the last case cited, death of cattle, caused from failure properly to purify the ship from the effects of a contagious disease through the carriage of cattle on a previous voyage, was held not within the terms of a bill of lading quite as broad as the present. These exceptions, however, do include "stowage," which embraces the distribution of the cattle, and of the other cargo; and they include also "perils of the seas arising from negligence," which would cover imprudent navigation. But as I cannot find that the loss of the cattle would have probably happened if there had been no negligence in these respects, notwithstanding the inferiority of the fittings, the validity of the exceptions, as depending upon the application of the English or the American law, is involved in the decision.

The question presented is a very important one. All the steam-ship lines, whether domestic or foreign, that sail from this port, insert in their bills of lading substantially the same conditions. Considering the number and magnitude of the shipments by these lines, and the very diverse views found in the text-books and decisions upon this branch of the conflict of laws, I have deferred a decision of the cause until able to give the questions involved something, at least, of the consideration their importance demands. The conclusion to which I have come is that our law must prevail, whether the question be viewed as a question of responsibility for a tort; or of the construction and validity of the exceptions in the bill of lading, in a conflict of laws; or as a question of evidence and procedure; or as a question of comity, as related to our national policy.

*First.* By the law of both countries negligence in a common carrier is a tort, as well as a breach of contract. It was upon its aspect as a tort that the decision of the court below was reversed on appeal, and only half damages given, in the case of *Chartered Mercantile, etc.*, v. *Netherlands, etc.*, 10 Q. B. Div. 521, 534. The tort found upon the facts in the present case is a tort committed partly within the exclusive jurisdiction of this country, and partly upon the high seas, within the exclusive jurisdiction of neither country. Under the terms of the bill of lading in this case, the English courts hold that, for such a tort, the ship and owners are not liable; the law of this country holds that they are liable. It is well settled, however, that responsibility for torts committed within the exclusive jurisdiction of the country of the forum, and affecting its own citizens, are determined according to its own laws.

It is only as respects tortious acts committed beyond its jurisdiction that any doubt has existed as to the remedy to be afforded. In the latter

cases, the principle generally accepted is that, to entitle the suitor to recover in a foreign forum, the act must have been tortious according to the law of the jurisdiction wherein it was committed, as well as by the law of the forum. West. Int. Law, § 186; Whart. Confl. Laws, §§ 475–478; Foote, Priv. Int. Law, 393, 410; *Phillips* v. *Eyre*, L. R. 4 Q. B. 225. But inasmuch as the high seas are the common ground of all nations, and are not governed by the merely municipal laws of either, the quality of acts committed on the high seas, as between persons or ships belonging to different nations, whose laws are different, is determined by the maritime law as accepted and administered in the forum where the suit is prosecuted. Hence acts, tortious by the law of England, if committed on the high seas, are actionable in England, though not tortious by the municipal law of the defendant's domicile, or of the ship's flag; and, in general, the law of the flag has no application to torts committed on the high seas, as between persons or ships of different countries having different laws. Foote, Priv. Int. Law, 398, 403; Mars. Coll. (2d Ed.) 208, 209, 212. The point was distinctly presented, and so adjudged, in the case of *The Leon*, 6 Prob. Div. 148. The same rule in this country has been repeatedly affirmed by the supreme court. *The Scotland*, 105 U. S. 24, 29; *The Belgenland*, 114 U. S. 355; S. C. 5 Sup. Ct. Rep. 860. In the latter case the court say, (page 369:)

"As to the law which should be applied in cases between parties or ships of different nationalities, arising on the high seas, not within the jurisdiction of any nation, there can be no doubt that it must be the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted."

The fact that, in most of the cases cited, the injury arose from collision is immaterial. The *gravamen* of the action is negligence. On that alone the action depends. It is the negligence only that constitutes the tort. It is so in this case, in its aspect as a tort; and as this negligence, resulting in damage to the libelants, occurred partly within our jurisdiction, and partly upon the high seas, the law applicable to the case, as one of tortious negligence, would seem, upon the above authorities, to be our own law, as the law of the forum.

*Second.* As a question of contract, concerning the construction and validity of the exceptions in the bill of lading, as between the different laws of England and the United States, our own law should, I think, prevail; whether the question be determined in view of the general maritime law, or by the presumed intent of the parties, upon the principles of comity. The "law of the flag," so called, which it is urged should govern the case, does not embody any rule of legal construction. Literally, it is but a concise phrase to express a simple fact, namely, the law of the country to which the ship belongs, and whose flag she bears, whether it accords with the general maritime law or not. In so far, however, as the law of the flag does not represent the general maritime law, it is but the municipal law of the ship's home. It has, therefore, no force abroad, except by comity. But foreign law is not adopted by comity, unless some good reason appear in the particular case why it should be

preferred to the law of the forum. The most frequent and controlling reasons are the actual or presumed intent of the parties, or the evident justice of the case arising from its special circumstances. On this ground, the law of the ship's home is applied, by comity, to regulate the mutual relations of the ship, her owner, master, and crew, as among themselves; their liens for wages, and modes of discipline. *The Johann Friederich,* 1 W. Rob. 35; *The Enterprise,* 1 Low. 455; *The Wexford,* 3 Fed. Rep. 577; *The J. L. Pendergast,* 29 Fed. Rep. 127. For the same reasons it is also applied, by comity, to torts on the high seas, as between vessels of the same nation, or vessels of different nations subject to similar laws, though not if they are subject to different laws. *The Scotland,* 105 U. S. 24, 30.

To what extent the law of the ship's home is entitled to be applied, by comity, to contracts of affreightment, made in a foreign port, has long been a mooted question. Opposite decisions have been made in this country. *Arayo* v. *Currel,* 1 La. 528; *Pope* v. *Nickerson,* 3 Story, 465. The later English decisions hold that the law of the ship's home port should govern as respects the future and unforeseen incidents of the voyage,—such as the execution of bottomry in a port of distress, and the liability of the owners for damages beyond the value of the ship and freight. This is rested, in part, upon the ground of the legal limitations of the master's authority to bind the owners personally; but more especially on the ground of the presumed intention of the parties, having reference to all the contingencies of navigation, and to the circumstances likely to arise in the prosecution of foreign voyages. *The Gaetano,* 7 Prob. Div. 137; *Lloyd* v. *Guibert,* 6 Best & S. 117; S. C. L. R. 1 Q. B. 115. In the case of *The Titania,* 19 Fed. Rep. 101, 103, a bill of lading, given in England upon a shipment of goods on an English ship, was accordingly assumed to be governed by the English law, as respects damages arising on the high seas. See, also, *Blanchet* v. *Powell's, etc., Co.,* L. R. 9 Exch. 74, 77.

Upon the reasoning in *Lloyd* v. *Guibert,* it has been asserted by a recent author (Foote, Priv. Int. Law, 329) that the law of the flag is "to regulate the liabilities and regulations which arise among the parties to the agreement, be it of affreightment or hypothecation, upon this principle: that the ship-owner who sends his vessel into a foreign port gives notice by his flag, to all who enter into contracts there with the shipmaster, that he intends the law of that flag to regulate those contracts, and that they must either submit to its operation, or not contract with him or his agent at all." If the law of the flag were accepted as authoritative and binding to the extreme extent thus stated, it would go far to sustain the respondent's claim in the present case. The doctrine claimed, however, does not appear to me to be warranted either on principle or by the authorities on which it purports to rest. It is inconsistent with the existence of any maritime law at all, as distinguished from mere municipal law; and in *Lloyd* v. *Guibert* the maritime law was ignored, (*The Karnak,* L. R. 2 P. C. 505, 512,) though the conclusion agreed with it. But in this country the general maritime law has been often

recognized by the supreme court as a guide in interpretation and construction, (*Norwich Co.. v. Wright*, 13 Wall. 104, 121;) and in some notable cases it has been made the ground, or one of the grounds, of the decision; when an adoption of the mere law of the flag would have led to an opposite conclusion, (*The Scotia*, 14 Wall. 170, 186–188; *The Scotland*, 105 U. S. 24, 29, 30.)

Practically, moreover, the extreme rule above declared would require all merchants to acquaint themselves, at their peril, with all the details of the municipal law of every nation with whose ships they might deal, even in ordinary commercial transactions; certainly a most onerous, if not impracticable, requirement.

In *Searight* v. *Calbraith*, 4 Dall. 327, Mr. Justice IREDELL said:

"Every man is bound to know the laws of his own country, but no man is bound to know the laws of foreign countries. In two cases, indeed, (and, I believe, only in two cases,) can foreign laws affect the contracts of American citizens: (1) Where they reside or trade in a foreign country; and (2) where the contracts, plainly referring to a foreign country for their execution, adopt and recognize the *lex loci.*"

These observations are precisely opposite to the contention of the claimants.

By the maritime law the owners are liable, up to the value of the ship and freight, for all the master's contracts in the business of the ship. Emerigon, Contracts a la Grosse, cited in *The Scotland*, 105 U. S. 28; *The Phebe*, 1 Ware, 263, 268; *The Paragon*, Id. 322. Wherever the general maritime law is recognized as a source of authoritative exposition or construction, it would seem, therefore, that the master's authority in foreign ports, in the absence of statutory definition, might well be held to be that which the general maritime law confers, without regard to any narrower limitations that may be imposed by the mere municipal law of the ship's home. In the case of *The Lottawanna*, 21 Wall. 558, 572, Mr. Justice BRADLEY says: "In matters affecting the stranger or the foreigner, the commonly received law of the whole commercial world is more assiduously observed, as, in justice, it ought to be." As respects any extension of the owner's personal liability beyond the rule of the maritime law, or any acts of the master beyond the scope of his authority as generally recognized by that law, the law of the flag may justly be invoked. In *Lloyd* v. *Guibert* the plaintiff sought to extend the shipowner's personal responsibility beyond that of the general maritime law, which was in fact the law of the flag; and the language of BLACKBURN, J., in the court below, quoted in part by the author above named, clearly appears from the context to have been used in reference to the shipowner's unlimited personal liability in a common-law action, such as that cause was; not as respects his limited liability under the maritime law.

Except as relates to this unlimited personal liability, the above-stated rule, to the broad extent asserted for it, is certainly not in accordance with the prior decisions in this country that hold British ships liable to a maritime lien for necessary supplies furnished here, though no such lien, or authority in the master to create such a lien, was then, or is

now, recognized by the law of the flag. *The Rio Tinto,* 9 App. Cas. 356; *The Walkyrien,* 3 Ben. 394; affirmed, 11 Blatchf. 241; *The Eliza Jane,* 1 Spr. 152; *The Selah,* 4 Sawy. 40; *Hatton v. The Melita,* 3 Hughes, 494. In several English cases, also, concerning bottomry bonds given in foreign ports, the validity of the law of the foreign port giving a maritime lien for necessary supplies, and a right to arrest the vessel therefor, is directly recognized as a ground of validating subsequent bottomry, though such a lien was contrary to the law of the flag. *The Vibilia,* 1 W. Rob. 1, 8; *The Prince George,* 4 Moore, P. C. Cas. 21, 25; *The Karnak,* L. R. 2 Adm. & Ecc. 289; S. C. L. R. 2 P. C. 505.

In the present case no question arises concerning the authority of the master, as respects future incidents of the voyage. The question concerns only the validity of the exceptions inserted in the bill of lading. On this subject the ordinary rule is that the law of the place where the contract is made governs, as respects the nature, validity, and interpretation of it, unless it be made with a view to performance elsewhere; and, in that case, it is governed by the law of the place where it is designed to be performed. Story, Confl. Laws, §§ 242, 280. This contract was made within the United States, *i. e.,* both the original agreement for the transportation of the cattle to Deptford, and also the bill of lading. As respects proper stowage, suitable cattle fittings, and general seaworthiness, the contract was to be performed wholly in Boston, *i. e.,* within the exclusive jurisdiction of the United States. As respects navigation, it was to be performed chiefly on the high seas; as respects final delivery, in England. The negligence found arose in part within the United States, and in part upon the high seas. The general rule of construction, in the form above stated, does not, therefore, afford a sufficient guide in this case, unless the same stipulation should be held valid or invalid, according as the acts of negligence are committed within the jurisdiction of England, or the jurisdiction of the United States; and, even then, the rule would not determine the question as respects acts of negligence committed on the high seas, within the exclusive jurisdiction of neither.

In the case of *Scudder* v. *Union Nat. Bank,* 91 U. S. 406, the supreme court say, pages 412, 413:

"Matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy,—such as the bringing of suits, admissibility of evidence, statutes of limitation,—depend upon the law of the place where the suit is brought."

The same language is repeated in *Pritchard* v. *Norton,* 106 U. S. 124, 130; S. C. 1 Sup. Ct. Rep. 102. But these distinctions are inconclusive here; because while, on the one hand, the question concerns the "validity" of the stipulation, and so would fall under the first branch of the rule, the negligence, on the other hand, and the stipulation for exemption from liability for negligence in the performance of the contract, are "matters connected with its performance," which would fall under

the second branch. Nor does this rule indicate what law is to be deemed to prevail when the place of the negligence is the high seas. The modern English and American decisions, while they approach the point, do not precisely meet it.

In *Peninsular, etc., Nav. Co.* v. *Shand*, 3 Moore, P. C. (N. S.) 290 and 291, TURNER, L. J., says:

"The general rule is that the law of the country where a contract is made governs as to the nature, the obligation, and the interpretation of it. The parties to a contract are either the subjects of the power there ruling, or, as temporary residents, owe it a temporary allegiance. In either case, equally, they must be understood to submit to the law there prevailing, and to agree to its action upon their contract. It is, of course, immaterial that such agreement is not expressed in terms. It is equally an agreement in fact, presumed *de jure;* and a foreign court, interpreting or enforcing it on any contrary rule, defeats the intention of the parties, as well as neglects to observe the recognized comity of nations."

In the recent case of *Watts* v. *Camors*, 115 U. S. 353, S. C. 6 Sup. Ct. Rep. 91, the question arose as to the amount of damages recoverable upon the refusal of a charterer to accept an English vessel, pursuant to a charter executed in New Orleans, by which a citizen of Louisiana had agreed to freight the ship, under a stipulated penalty; the libelants claiming the whole stipulated penalty under the law of that state, whereas, by the general maritime law of both England and this country, the actual damages only could be recovered. The court held that the case was not governed by the local law of Louisiana, and say, (GRAY, J.:)

"The law of Louisiana does not govern this question, whether it is treated as a question of construction of the contract of the parties, or as a question of judicial remedy. If it is considered as depending upon the intent of the parties, as manifested by their written contract, the performance of that contract is to be regulated by the law which they must be presumed to have had in view when they executed it. Americans and Englishmen, entering into a charter-party of an English ship for an ocean voyage, *must be presumed to look to the general maritime law of the two countries*, and not to the local law of the state in which the contract is signed."

The rule indicated by this case is not simply the law of the place of performance, but "the law that the parties must be presumed to have had in view in making the contract;" thus returning to the form of the rule as expressed by Lord MANSFIELD in *Robinson* v. *Bland*, 2 Burr. 1078. The presumed intent of the parties, however, is the basis of the common rule making the law of the place of performance govern, instead of the law of the place of the execution of the contract, (Story, Confl. Laws, § 280;) and all the late cases emphasize the intent of the parties, either actual or presumed, as the controlling feature. The case of *Watts* v. *Camors* was decided, it will be also observed, not upon the ground that "the law of the flag" prevailed, *i. e.*, the law of England alone, but on the ground that the law that the parties are presumed to have had in view should control, and that that law must be presumed to be the general maritime law of the two countries. That decision, however, does not directly answer the present question; because the general maritime law, as admin-

istered in England, is opposite to that of this country, as respects the validity of stipulations exempting carriers from liability for negligence. But in so far as that case rejects the law of the flag as presumably representing the intent of the parties, and substitutes therefor the maritime law of the two countries, it would sustain the authority of our own law in a case of difference; because no foreign law can be adopted by comity, unless some prevailing reason be found for preferring it to our own; and, if the two apply equally, ours must stand here, unless a different intention be proved, or be legally inferred.

In the oft-quoted case of *Lloyd* v. *Guibert*, L. R. 1 Q. B. 115, where the libelant, pursuant to a charter-party executed in England, had loaded cargo, at the Danish island of St. Thomas, on board a French vessel commanded by a French master, who, in the course of the voyage, had executed a bottomry bond upon the ship and cargo, and, by reason of subsequent disasters, the ship was afterwards surrendered in discharge of the owner's liability, pursuant to the French law, it was held that the French law governed the contract as the law of the flag, which the parties, under the circumstances, were presumed to have had in view as the governing law of the transaction; and that the libelant could not, therefore, after such surrender, recover of the French owners, in accordance with the English law, any part of the amount that he had been obliged to pay in consequence of the bottomry of his goods, though he would have been entitled to do so under the English law. But this case referred, not to the validity of any of the *express terms* of the contract itself, but only to the law governing the contract as respects the extent of the owner's liability "for sea damage to the ship, and its ordinary result." The court, in conclusion, say, (page 129:)

"The general rule that, where the contract of affreightment does not provide otherwise, there, as between the parties to such contract, *in respect of sea damage and its incidents,* the law of the ship should govern, seems to be not only in accordance with the *probable intention* of the parties, but also most consistent and intelligible, and therefore most convenient to those engaged in commerce."

The decision has no reference to the validity of the terms of the original contract, or to the law by which its validity is to be determined. The general rule on that point, as above stated, is repeatedly recognized. Pages 122, 123.

In the case of *The Gaetano*, 7 Prob. Div. 1, 137, a question arose in regard to the validity of a bottomry bond, for want of communication with the owner. The cargo was shipped at New York, on board an Italian vessel which had been chartered for the purpose in London. The ship, in the course of the voyage, having put into Fayal in distress, the master executed a bottomry bond in accordance with the Italian law; but without any such communication with the owners of the cargo as was practicable, and such as by the English and American law was necessary to make the bottomry valid. It was held that the Italian law, as the law of the flag, prevailed, as presumptively the law contemplated by the parties to the charter and shipment, and that the bond was valid.

This case, also, had no reference to the validity of any of the express terms of the contract, but to the incidental authority of the master, in unforeseen contingencies that happened in the prosecution of the voyage. I cannot reconcile this decision, however, with that of the earlier case of *The Hamburg*, 2 Moore, P. C. (N. S.) 289, where an opposite result was arrived at.

The case of *Chartered Mercantile Bank of India* v. *Netherlands, etc., Co.*, 10 Q. B. Div. 521, was brought to recover damages for an injury to cargo in a case of collision. A bill of lading exempting from liability for negligence had been given at Singapore, an English port, by the captain of the ship, which was registered in Holland, and which carried the Dutch flag. BRETT, L. J., says, (page 529:)

"Even if this is to be regarded as a Dutch ship, it seems to me that the contract is nevertheless English. It may be true, in one sense, to say that, where the ship carries the flag of a particular country, *prima facie* the contract made by the captain of that ship is a contract made according to the law of the country whose flag the ship carries. But that is not conclusive. The question what the contract is, and by what rule it is to be construed, is a question of the intention of the parties, and one must look at the circumstances, and gather from them what was the intention of the parties. In this case the persons for whose benefit the ship was employed, and for whom the ship was earning profit, were undoubtedly the defendants, every one of whom is an Englishman. The defendants are registered in Holland as a Dutch company, but they are also registered in England as an English joint-stock company. The contract was made in an English form. The contract, therefore, was made by a servant and agent of the defendants, who authorized that contract to be made in order to obtain profit for themselves. The contract was made for the carriage of goods from an English port to a Dutch port. It was made with an English merchant. The contract was drawn up in the English language, in the ordinary form of an English bill of lading, and the defendants were named in the contract as a limited company; in other words, they were described as an English company. It seems to me that, upon taking those circumstances into consideration, the inference is irresistible that it was the intention of the parties that the contract should be an English contract, even though one considers the ship to have been a Dutch ship, which I think she was not. If the contract be English, it must be construed according to the rules for construing an English bill of lading."

The latest English case on this subject that I have met is that of *Jacobs* v. *Credit Lyonnais*, (1884,) 12 Q. B. Div. 589, in which the defendants, a firm in London, contracted in London with the plaintiffs, who were also merchants in London, to deliver to the latter 20,000 tons of Algerian esparto, to be shipped by the Compagnie Franco-Algerienne, from Arzew, during the year 1881, upon ships to be supplied by the plaintiffs, in about equal proportions in each month. The agreement contained numerous provisions in regard to the shipment by steamers from Algiers, and the plaintiffs were required to accept and approve of the esparto as put on board in that country. After the partial execution of the contract, its further performance was rendered impossible through the outbreak of an insurrection in Algiers, and the consequent military operations there, which, by the French law prevailing in that country, constituted a case of *major force* that discharged the defendants from the

further performance of their contract. Notwithstanding the fact that the esparto was to be accepted and approved in Algiers, it was held that the contract was subject to the English law, and not the French law; that the contract was not, therefore, discharged; and that the defendants were liable for the non-delivery of the residue of the goods under the contract. The court, BOWEN, L. J., after referring to the ordinary rule that the law of the place where the contract is made is *prima facie* that which the parties intended, and which ought to be adopted, as the footing upon which they dealt, says:

"It is obvious, however, that the subject-matter of each contract must be looked at as well as the residence of the contracting parties, or the place where the contract is made. The place of performance is necessarily, in many cases, the place where the obligations of the contract will have to be enforced; and hence, as well as for other reasons, has been introduced another canon of construction, to the effect that the law of the place of fulfillment of a contract determines its obligations. But this maxim, as well as the former, must, of course, give way to any inference that can legitimately be drawn from the character of the contract and the nature of the transaction. In most cases, no doubt, *where a contract has to be wholly performed abroad,* the reasonable presumption may be that it is intended to be a foreign contract, determined by foreign law; but this *prima facie* view is, in its turn, capable of being rebutted by the expressed or implied intention of the parties, as deduced from other circumstances. *Again, it may be that the contract is partly to be performed in one place and partly in another. In such a case, the only certain guide is to be found in applying sound ideas of business, convenience, and sense to the language of the contract itself, with a view to discovering from it the true intention of the parties.* Even in respect of any performance that is to take place abroad, the parties may still have desired that their liabilities and obligations shall be governed by English law, or it may be that they have intended to incorporate the foreign law to regulate the method and manner of performance abroad, without altering any of the incidents which attach to the contract according to English law. Stereotyped rules, laid down by juridical writers, cannot, therefore, be accepted as infallible canons of interpretation in these days, when commercial transactions have altered in character, and increased in complexity; and there can be no hard and fast rule by which to construe the multiform commercial agreements with which, in modern times, we have to deal."

The facts of the case were there held insufficient to rebut the ordinary presumption that the law of the place where the contract is made governs its interpretation, and the contract was therefore held to be subject to the English law.

The same general question was elaborately considered, also, by Mr. Justice MATTHEWS, in the case of *Pritchard* v. *Norton*, 106 U. S. 124, S. C. 1 Sup. Ct. Rep. 102, where a bond had been executed in New York which would be void there for want of consideration, though valid in Louisiana, where the transaction out of which it grew originated; and it was held that, from the circumstances, "the situation, and the relation of the parties, the obligation was entered into in view of the laws of Louisiana," and on that ground it was upheld.

So, in *Morgan* v. *New Orleans, etc., R. Co.*, 2 Woods, 244, a contract was executed in New York which provided for the performance of different

parts of the contract in different states,—some in New York, but largely in several southern states, including the building of a railroad in Louisiana,—for breach of the latter part of which a bill was filed in Louisiana to rescind the contract. The plaintiff would have been entitled to that relief had the law of that state been the law of the contract; otherwise not. It was held by Mr. Justice BRADLEY that such cases must be governed each by its own circumstances; and, though the building of a railroad in Louisiana was deemed a very important consideration of the contract, it was not held sufficient to control the whole contract. or to entitle the plaintiff to its rescission, but that it was, in that respect, governed by the law of New York, as the place where the contract was made, and to be in part performed. This case, it will be observed, was treated much in the same way as that of *Jacobs* v. *Credit Lyonnais*, above cited.

The reported cases arising out of the carriage of passengers in relation to loss of baggage, and the limitations upon the carrier's responsibility, show that the decisions follow the presumed intention of the parties, rather than any technical rule. In *Peninsular, etc., Co.* v. *Shand*, 3 Moore, P. C. (N. S.) 280, an English company agreed to carry the plaintiff, an Englishman, from Southampton to Mauritius, in the defendant's ship, exempting itself from liability for loss of baggage. The court held the English law to be the intended law of the contract, and not that of France, the place of destination.

So, in *Cohen* v. *South Eastern Ry. Co.*, 2 Exch. Div. 253, the plaintiff, an Englishman, took a ticket from an English railroad company, at Boulogne, for a passage to London, and his baggage was lost by negligence in the Channel. Counsel agreed that it was an English contract, but the court intimate that, *as regards any loss that might have happened within French territory*, the French law would have controlled.

In *Brown* v. *Railroad Co.*, 83 Pa. St. 316, the plaintiff bought a ticket in Philadelphia for a passage to Atlantic City, over the Camden Railroad, a New Jersey corporation. His trunk was lost. On the trial it was held that the law of New Jersey governed, and that the defendants were not entitled to a limitation of damages to $300, under the Pennsylvania statutes, merely because the ticket was bought in Philadelphia, and the contract made there.

In *Curtis* v. *Delaware, L. & W. R. Co.*, 74 N. Y. 116, it was similarly held, where the plaintiff took passage at Scranton, Pennsylvania, for New York city, and his trunk was lost after its arrival in New York city, that the restriction of the Pennsylvania state statutes was not applicable, and that the contract should be governed by the law of New York, where the negligence happened, and where the baggage was to be delivered.

In these several cases, concerning passengers' baggage, though there is no extended discussion of principles, there is an evident disposition to regard the law of the place where the negligence occurred as the law impliedly intended by the parties to govern that part of the contract.

From the later English authorities, above cited, it is apparent that

the "law of the flag," so called, is not even there held to represent any controlling principle of law. It has no application to torts, and, as respects the construction of contracts, its application depends wholly upon the intent of the parties, actual or presumed, or on the manifest justice of the case as shown by the special circumstances. The nationality of the ship is but a single circumstance, among many others, all of which are to be taken into account. *Prima facie*, as all agree, the validity of the contract is governed by the law of the place where it is made, unless it is to be "wholly performed elsewhere." *Lloyd* v. *Guibert*, L. R. 1 Q. B. 122; *Jacobs* v. *Credit Lyonnais, supra.*

This contract was neither wholly nor chiefly to be performed within English jurisdiction. It was made here, and was to be chiefly performed either here or upon the high seas. The original contract was not even made with the master, but with the resident agent of the ship-owners, and with no exceptions as to negligence. Doubtless the ordinary bill of lading must be presumed to have been intended. The ordinary bill of lading was given, with the same exceptions inserted in it as regards negligence that are now usually inserted, for what they are worth, by all steamers alike, whether foreign or domestic. The exceptions exempting from the consequences of negligence have been long held void by the federal law, as was presumptively known to both parties. Had the form of the bill of lading been proved to be peculiar to British ships, that would have been one circumstance to indicate that a British contract, under British law, might have been intended. But its common use by all lines alike prevents any inference that the British law was intended from the mere presence of an exception common to all, or because it is held valid in England, while invalid here.

If the situation and natural expectation of the shipper be regarded, it is not reasonable to presume that he intended to renounce the superior protection secured to him by his own law, to which he was entitled, in favor of a foreign law less to his advantage; and, as respects the master and owner of the ship, how can they be "reasonably presumed" to have been counting upon an immunity in making contracts here which is denied to our own ships, when the contract is silent on the subject? In the language of TURNER, L. J., above quoted, "he owed a temporary allegiance here, and must be understood to submit to the law here prevailing, and to agree to its action on his contract."

In the cases of *Lloyd* v. *Guibert* and *The Gaetano*, above referred to, a long array of special considerations, drawn from the general experience, convenience, or necessities of commerce, as respects the questions there presented, sustained the conclusion of the court, which, in the former case, was in accord, and in the latter was certainly not discordant, with the general maritime law. In the present case no such circumstance exists, and the exemption from liability claimed is directly opposed to the immemorial law of the seas, and is so contrary to natural justice and expediency that, even where the exemption is upheld at all, it is under so high disfavor that every intendment is made against it by construction; and, in the federal courts, it is held so unreasonable as to be deemed ex-

torted without the shipper's real assent, and void. In the federal courts, at least, it would therefore seem to be impossible to hold that the parties can be "reasonably presumed" to have intended to adopt a foreign law in order to uphold a stipulation which is so unreasonable as to be deemed extorted, and void. As a question of fact and law, I must hold, as was intimated by Mr. Justice BLATCHFORD in the case of *The Montana*, 22 Fed. Rep. 715, 728, that there is "nothing in these contracts of affreightment to indicate any contracting in view of any other law than the recognized law of such forum in the United States as should have cognizance of suits on the contracts."

*Third.* In one aspect the question is one of evidence and procedure, which is always governed by the law of the forum. The carrier is liable for negligence unless he establishes some contract of exemption, and the sufficiency of the proof of such a contract must be judged by the law of the forum. Ordinarily, doubtless, proof of the acceptance by the shipper of the shipping receipt or bill of lading, without objection, is sufficient; because the law generally implies therefrom an assent to its terms. But this rule is not without familiar exceptions; and where, under special circumstances, such assent is negatived, or is not implied by the law, the contract is not proved. Whether assent is implied by the law or not depends upon the *lex fori*. Hutch. Carr. § 45.

In some of the states it is the settled law that no assent to any limitation of the common-law liability of carriers is to be implied from the mere acceptance of the bill of lading, without further proof. Hutch. Carr. § 240, note; *Field* v. *Railroad Co.*, 71 Ill. 458; *Gaines* v. *Union Transp.*, *etc.*, *Co.*, 28 Ohio St. 418. And such seems to be the federal law, as regards any implied assent to stipulations exempting from the consequences of negligence, which are deemed extorted from the public without any real assent.

Thus, in *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 379, the court say:

"The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle or stand out and seek redress in the courts. His business will not admit such a course. He prefers, rather, to accept any bill of lading or sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases, he has no alternative but to do this, or abandon his business. * * * The inequality of the parties, the compulsion under which the customer is placed, and the obligations of the carrier to the public, operate with full force to divest the transaction of validity."

The same language, in effect, is used in *Express Co.* v. *Caldwell*, 21 Wall. 264, 266.

In the case of *The Montana*, 22 Fed. Rep. 715, 727, Mr. Justice BLATCHFORD, in reviewing the results of the supreme court decisions, says that "the carrier cannot be permitted to stipulate for immunity for the negligence of his servants. The business of a carrier is a public one, and those who employ the carrier have no real freedom of choice, and the carrier cannot be allowed to impose conditions adverse to public policy and morality."

In the case of *Railroad Co.* v. *Manufacturing Co.*, 16 Wall. 318, it was held that exemptions printed on the back of the shipping receipt, though referred to in the body of the receipt as a part of the terms of shipment, were not to be presumed assented to, and were no part of the contract, because the qualifications of the carrier's responsibility were unreasonable, and the law would not presume acquiescence in the conditions.

In *Ayres* v. *Western R. Corp.*, 14 Blatchf. 9–13, WALLACE, J., observes that the shipper is not to be deprived of the benefit of the common-law liability of the carrier without clear evidence of his assent.   See, also, *Rackett* v. *Stickney*, 27 Fed. Rep. 878.

In *Railway Co.* v. *Stevens*, 95 U. S. 655, 659, Mr. Justice BRADLEY, referring to the railway ticket with its printed exemptions, says: "It was not *evidence* of any contract by which the plaintiff was to assume all the risk, and would not have been valid if it had been."

A very similar question arose in the case of *Hoadley* v. *Transportation Co.*, 115 Mass. 304.   There an engine had been delivered to the defendant at Chicago, for transportation to Lawrence, Massachusetts, but was destroyed at Chicago in the great fire of 1871, without the defendant's fault.   The defendant had given its receipt, excepting loss by fire while in depot or in transit.   By the law of Illinois, where the contract was made, the mere acceptance of the receipt did not import assent to its exceptions, without additional proof; while by the law of Massachusetts, where the suit was brought, the acceptance of the receipt without dissent was sufficient proof of the contract, and of assent to all of its exceptions from losses not arising through negligence.   At the trial the receipt was put in evidence without further proof than its delivery to the shipper, and the plaintiff recovered, the court holding that the law of Illinois governed.   Upon appeal, the ruling below was reversed, on the ground that the question concerned only the *mode of proof* of the contract set up in the receipt, and that, as a question of evidence, the case was governed by the law of the forum.   The court say:

"The nature and validity of the special contract set up is the same in both states.   It is only a difference in the mode of proof.   A presumption of fact in one state is held legally sufficient to prove assent to the special contract relied on to support the defense.   In the other state it is held not to be sufficient.   It is as if proof of the contract depended upon the testimony of a witness competent in one place and incompetent in the other."

So, in the present case, since, by the federal law, the shipper's assent to such stipulations is not legally implied by acceptance of the bill of lading or shipping receipt, no contract, as respects such stipulations, is legally proved, according to the law of the forum.

*Fourth.*   Besides the above general considerations, a special reason why the foreign law could not, in any event, be adopted in this case, is found in the repeated adjudications of the supreme court that such stipulations are against the public policy of the country, and are on that ground illegal and void.   Contracts, though designed to be performed elsewhere, are void, if criminal or illegal where made; *i. e.*, if the very promise or con-

dition which is the consideration of the contract, as distinguished from the thing to be done by the other party, be illegal where made,—the only exceptions being cases arising under the laws against usury; and a foreign law is never adopted by comity where it would be against the public policy of the country of the forum, and prejudicial to its citizens. Story, Confl. Laws, §§ 243, 244, 324; Westl. Priv. Int. Law, §§ 203, 204; *Miller* v. *Tiffany*, 1 Wall. 298, 310; *Blackwell* v. *Webster*, 23 Blatchf. 537; *Hyde* v. *Goodnow*, 3 N. Y. 269.

Nothing could be more unequal or prejudicial to our own citizens, or more suicidal in national policy, than to uphold, in favor of foreign ships, stipulations, as respects carriage here or upon the high seas, which, when made by our own carriers, we declare to be against public policy, extortionate, and void. As respects such stipulations, foreign ships cannot stand on any different footing from our own, nor can a foreign law be suffered to subvert our own law to the prejudice of our own ships. No comity demands that. Whatever force, therefore, the law of the flag might ordinarily have abroad, it cannot override, in a foreign forum, these fundamental principles of international law. This plainly appears, also, from the same author above quoted, who makes the largest claim for the law of the flag, and who elsewhere says:

"Wide as the operation necessarily is which is given to the *intention* of the parties to a contract, it is plain that it can have no effect upon the question of the legality or illegality of the thing contracted for. No law can permit itself to be evaded, nor can it, consistently with the principles of international jurisprudence, sanction the evasion of a foreign law. Thus, if the thing contracted to be done is illegal by the law of the place of the intended performance, the contract should be held void, wherever it was actually entered into, by all courts alike. Where, however, it is the contract itself—the exchange of a certain consideration, either for any or for a certain promise— that one of the competing laws claims to forbid, the question assumes a different form. In such a case it would seem that the legality of the agreement must be decided by the law of the place where it is made. It appears clear, at any rate, that a contract illegal by that law will not be recognized or adopted by the English courts, though the converse case, where a contract was legal where made but is forbidden by English law, may often prove a more complex one. No tribunal can, of course, be called upon to sanction or enforce any agreement which is contrary to its own notions of justice or morality." Foote, Priv. Int. Law, 287, 288.

The question here considered does not touch the mere performance of the contract, *i. e.*, the mere carriage and delivery of the goods. It touches the supposed promise on the shipper's part, or the conditions exacted by the carrier, as a consideration of his undertaking the transportation, viz., that he shall not be *liable* for negligence in the course of the performance of his contract. This promise or condition or consideration was given or exacted in this country; and, though relating to the performance, in one sense, was yet, as a promise or condition exacted here, wholly independent of the performance itself, being complete before the performance began. This case would seem to fall, therefore, clearly within the rule as laid down by the author last cited.

The cases of *Branley* v. *Southeastern R. Co.*, 12 C. B. (N. S.) 63, and

*Parker* v. *Great Western R. Co.*, 11 C. B. 545, illustrate the distinction between illegality of performance and illegality of the promise which is the consideration of performance. In the former case the law of France, where the contract was made, was held to determine the validity of the carrier's stipulation for increased rates on "packed parcels," though the transportation was to be partly in England, where increased charges were illegal.

Any additional express stipulation inserted by our own carriers in their bills of lading adopting the foreign law as the law of the contract, would be regarded as but an additional extortion or evasion, designed for the same illegal end, and would not be suffered to overturn the policy of the federal law on this subject, any more than an express contract to absolve from negligence, signed by the shipper, would do, (*Railway Co.* v. *Stevens*, 95 U. S. 655, 659;) and if such an express stipulation by our own carriers could not be upheld in favor of our own citizens, an implied one to the same effect, in favor of a foreign ship, if any such could be implied, is no better. In my judgment, all stipulations made here, of whatever form, designed to secure, directly or indirectly, the exemption of the carrier from the consequences of his own negligence, whether the carrier is a domestic or a foreign ship, are equally illegal and void under the federal law. *Phœnix Ins. Co.* v. *Erie & W. Transp. Co.*, 117 U. S. 312, 322, 323; S. C. 6 Sup. Ct. Rep. 750, 1176; *The Hadji*, 22 Blatchf. 235; S. C. 20 Fed. Rep. 875; *New Jersey Steam Nav. Co.* v. *Merchants' Bank*, 6 How. 344.

In no aspect in which I am able to view it does the provision of the bill of lading as to negligence afford a defense, and the libelant is therefore entitled to a decree, with costs. A reference may be taken to compute the damages.