## THE "SCOTLAND."

1. The act of March 3, 1851, c. 43, reproduced in the Revised Statutes in sects. 4282, &c., applies to owners of foreign as well as domestic vessels; and to acts done on the high seas as well as in waters of the United States, except when a collision occurs between two vessels of the same foreign nation, or perhaps of two foreign nations having the same maritime law.

2. The maritime law of the United States, as found in the statute, is the same as the general maritime law of Europe, and is different from that of Great Britain in this, that the former gauges the liability by the value of the ship and freight after loss or injury, and the latter by their value before the loss or injury, not exceeding £15 per ton.

3. The maritime law is only so far operative as law in any country as it is adopted by the laws and usages of that country. The principles laid down on this subject in *Norwich Company* v. *Wright* (13 Wall. 104), and in *The Lottawana* (21 id. 558), reasserted and affirmed.

4. The courts of every country will administer justice according to its laws, unless a different law be shown to apply; and this rule applies to transactions taking place on the high seas. If a collision occur on the high seas between two vessels, controversies arising therefrom will be governed in the courts of this country by our laws, unless the two colliding ships belong to the same foreign country, or perhaps to different countries using the same law, when they will be governed by the laws of the country to which they belong.

5. Ship-owners may avail themselves of the defence of limited responsibility by answer or plea as well as by the form of proceeding prescribed by the rules of this court, at least so far as to obtain protection against the libellants or plaintiffs in the suit. Those rules were not intended to restrict them, but to aid them in bringing into concourse those having claims against them arising from the acts of the master or crew.

6. If the owners plead the statute, a decree may be made requiring them to pay into court the limited amount for which they are liable, and distributing

said amount *pro rata* amongst the parties claiming damages. Such a proceeding in a court of admiralty would be an "appropriate proceeding" under the statute.

7. It is not necessary that ship-owners should surrender and transfer the ship in order to claim the benefit of the law. That is only one mode of relief. They may plead their immunity, and, if found in, or confessing, fault, may abide a decree against them for the value of ship and freight as found by the proofs.

8. The rule of damages, in case of goods lost or destroyed on the high seas by the fault of those in charge, is the price or value of the goods at the place of shipment, with all charges of lading, insurance, and transportation, and interest at six per cent per annum, but without any allowance for anticipated profits.

9. When the goods have no market value at the place of shipment, resort may be had to other means of ascertaining their actual value, such as the price which they usually bring at the port of destination, with a fair deduction for profits and charges.

APPEALS from the Circuit Court of the United States for the Eastern District of New York.

The facts are stated in the opinion of the court.

The case was argued by *Mr. William Allen Butler*, with whom was *Mr. Thomas E. Stillman* and *Mr. John Chetwood*, for the "Scotland,". and by *Mr. James C. Carter* and *Mr. Robert D. Benedict*, with whom was *Mr. Joseph H. Choate*, for the libellants.

MR. JUSTICE BRADLEY delivered the opinion of the court.

The steamship "Scotland," belonging to the National Steam Navigation Company, a corporation of Great Britain, sailed from New York for Liverpool, on the 1st of December, 1866, with freight and passengers; and after reaching the high sea, opposite Fire Island light, ran into the American ship "Kate Dyer," bound from Callao, in the republic of Peru, to New York, laden with a cargo of guano. The "Kate Dyer" immediately sank, and ship and cargo were totally lost. The steamship suffered so severely from the collision that she put back, but was unable to get further than the middle ground outside and south of Sandy Hook, where she also sank and became a total loss, with the exception of some stripping of ship's material, consisting of anchors, chains, rigging, and cabin furniture got from her by the Coast Wrecking Company before she went down. Libels *in personam* were filed in the District Court for

the Eastern District of New York, against the Steam Naviga-
tion Company by the owners of the "Kate Dyer," the Peru-
vian government, owner of her cargo, and by a passenger and
some of the crew who lost certain effects by the sinking of the
ship. Personal service of process not being obtainable, the
marshal attached another vessel belonging to the steamship
company, lying in the port of New York, which was duly
claimed and released on stipulation, and the steamship com-
pany appeared and responded to the libel. The answer ad-
mitted the collision, but denied that the "Scotland" was in
fault, and further alleged as follows: "Respondents further
answering say, that said steamer 'Scotland' was by said col-
lision sunk and destroyed, and that there is no liability *in per-
sonam* against these respondents for said loss of the 'Kate
Dyer.'" Proofs being taken, the District Court rendered a
decree in favor of the libellants, which, on appeal to the Cir-
cuit Court, was substantially affirmed. The owners of the
"Kate Dyer" were awarded $56,000, with interest; the owners
of the cargo, $57,375, with interest; and the passengers and
crew, upwards of $11,000, with interest.

On the trial in the Circuit Court, the respondents, besides
contesting the question of fault and general liability, again
insisted upon the benefit of the limited liability law, and pro-
posed for adoption by the court a certain finding of fact and
conclusion of law looking to that end. The finding of fact
was substantially adopted by the court as follows: —

"The steamer was, by reason of the said collision and in con-
sequence thereof, so injured that, although at once put about,
she could only reach the 'outer middle,' so called, on the west
side of the channel south of Sandy Hook, where she sank and be-
came a total loss, except that a large amount of anchors, chains,
rigging, and cabin furniture, of the value of several thousand
dollars, was saved from her and delivered to the agent of the
respondents. She earned no freight, the voyage being broken
up. The passage-money paid in advance by the passengers
was $1,703.65; of this $225 was refunded to such of them as
could not wait to be transported by the respondents in another
vessel of their line; the remaining passengers were forwarded
by the 'Queen,' and the expense charged to the 'Scotland.'

Irrespective of the carriage of the passengers by the ' Queen,' the respondents paid return money as above, $225, and the expenses of bringing the passengers to New York, and taking care of them before they were reshipped, $566.83, in all, $791.83; the balance of the passage-money, $911.82, was credited to the ' Queen ' and charged to the ' Scotland.' "

The conclusion of law proposed and insisted on by the respondents as legitimately arising upon this fact was as follows, to wit : —

" The liability of the respondents, as owners of the said steamship ' Scotland,' did not extend beyond the value of their interest in the vessel and her pending freight at the time of the collision; and the vessel having been lost by the collision, and no freight or passage money earned, the respondents are thereby discharged from any liability on account thereof."

The Circuit Court, as before stated, refused any relief grounded on the limited liability law, but made a decree against the respondents for the total amount of damages sustained by the various parties in interest. To this conclusion the respondents excepted.

Both parties appealed from the decree, and the case is now before us for review. The appeal of the libellants was based on what they supposed to be an erroneous conclusion of the court in reference to the allowance of interest, and the estimation of the value of the cargo.

The principal question raised and argued on this appeal is, whether the steamship company is entitled to the benefit of a limited responsibility equal to the value of the steamship and freight after the collision occurred, — a liability which, in this case, as the vessel and freight were a total loss, would only amount to the value of the articles saved by the wrecking company. It is contended by the company that it is entitled to the benefit of such limitation, either under the general maritime law or under the act of Congress of March 3, 1851, c. 43. On the other side, it is contended that the general maritime law on this subject (if there be any) is not in force in this country, and that the benefit of the act of Congress cannot be claimed by foreign vessels. It is further contended by the

libellants that the steamship company, even if it might have had the benefit of the rule, failed to take the proper steps for obtaining it, — *first*, in not filing a petition according to the rules of this court; and, *secondly*, in not surrendering the property recovered from the wreck, or its proceeds.

In the case of *Norwich Company* v. *Wright* (13 Wall. 104) we had occasion to state that the general maritime law of Europe only charges innocent owners to the extent of their interest in the ship for the acts of the master and crew, and that if the ship is lost their liability is at an end. This rule is laid down in several places in the ancient code called the Consolato del Mare, and in many other authorities which are quoted and commented upon by Judge Ware in the case of *The Rebecca* (Ware, 187); and it is specifically formulated in various national ordinances and codes, amongst others, in the Marine Ordinance of Louis XIV., adopted in 1681. Emerigon, in his treatise of Contracts " a la Grosse," says : " The owners of the ship are bound *in solidum* by everything which the captain does in the course of the voyage for the promotion of the voyage. . . . But this action *in solidum* does not exist against the owners farther than according to the interest which they have in the body of the ship ; hence, if the ship perish, or if they abandon their interest, they are no longer liable for anything. It is thus that the maritime laws of the Middle Age have directed ; such is the law which is observed in the North ; and such is the regulation of our own ordinance : " and he refers to the Consolato and other authorities. The text of the French ordinance, which is regarded as merely formulating the old customary law, is as follows : " The owners of ships are responsible for the acts of the master, but they become discharged therefrom by abandoning the ship and freight."

But whilst this is the rule of the general maritime law of Europe, it was not received as law in England nor in this country until made so by statute. The English statutes, indeed, have not yet adopted, to its full extent, the maritime law on this subject. They make the owners responsible to the value of ship and freight at the time of the injury (that is, immediately before the injury), although the ship be destroyed, or injured by the same act, or afterwards in the same voyage ;

whilst our law adopts the maritime rule of graduating the liability by the value of the ship after the injury, as she comes back into port, and the freight actually earned; and enables the owners to avoid all responsibility by giving up ship and freight, if still in existence, in whatever condition the ship may be; and, without such surrender, subjects them only to a responsibility equivalent to the value of the ship and freight as rescued from the disaster.

But, whilst the rule adopted by Congress is the same as the rule of the general maritime law, its efficacy as a rule depends upon the statute, and not upon any inherent force of the maritime law. As explained in *The Lottawana* (21 Wall. 558), the maritime law is only so far operative as law in any country as it is adopted by the laws and usages of that country; and this particular rule of the maritime law had never been adopted in this country until it was enacted by statute. Therefore, whilst it is now a part of our maritime law, it is, nevertheless, statute law, and must be interpreted and administered as such. Then, does it govern the present case?

In administering justice between parties it is essential to know by what law, or code, or system of laws, their mutual rights are to be determined. When they arise in a particular country or State, they are generally to be determined by the laws of that State. Those laws pervade all transactions which take place where they prevail, and give them their color and legal effect. Hence, if a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it were shown what that law was. If not shown, we would apply our own law to the case. In the French or Dutch tribunals they would do the same. But, if a collision occurs on the high seas, where the law of no particular State has exclusive force, but all are equal, any forum called upon to settle the rights of the parties would *prima facie* determine them by its own law as presumptively expressing the rules of justice; but if the contesting vessels belonged to the same foreign nation, the court would assume that they were subject to the law of their nation carried under

their common flag, and would determine the controversy accordingly. If they belonged to different nations, having different laws, since it would be unjust to apply the laws of either to the exclusion of the other, the law of the forum; that is, the maritime law as received and practised therein, would properly furnish the rule of decision. In all other cases, each nation will also administer justice according to its own laws. And it will do this without respect of persons, to the stranger as well as to the citizen. If it be the legislative will that any particular privilege should be enjoyed by its own citizens alone, express provision will be made to that effect. Some laws, it is true, are necessarily special in their application to domestic ships, such as those relating to the forms of ownership, charter-party, and nationality; others follow the vessel wherever she goes, as the law of the flag, such as those which regulate the mutual relations of master and crew, and the power of the master to bind the ship or her owners. But the great mass of the laws are, or are intended to be, expressive of the rules of justice and right applicable alike to all.

The act of Congress creating a limited responsibility of ship-owners in certain cases, first passed March 3, 1851, and reproduced in sects. 4282–4289 of the Revised Statutes, is general in its terms, extending to all owners of vessels without distinction or discrimination. It declares that " the liability of the owner of any vessel for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." This statute declares the rule which the law-making power of this country regards as most just to be applied in maritime cases. The great carrying trade by land is governed by substantially the same principle; being in the hands of corporate associations, whose members are not personally liable for acts of the employés, but risk only the amount of their capital stock in the corporation. The doctrine of *respondeat superior*, it is true, applies to the cor-

porations themselves; but that does not interfere with the personal immunity of the shareholders. Whenever the public interest requires the employment of a great aggregation of capital, exposed to immense risk, some limitation of responsibility is necessary in order that men may be induced to contribute to the enterprise. As Grotius says, in reference to this very matter of ship-owners, " Men would be deterred from owning and operating ships, if they were subject to the fear of an indefinite liability for the acts of the master." Jure B. & P., lib. 2, c. 11, s. 13.

But it is enough to say, that the rule of limited responsibility is now our maritime rule. It is the rule by which, through the act of Congress, we have announced that we propose to administer justice in maritime cases. We see no reason, in the absence of any different law governing the case, why it should not be applied to foreign ships as well as to our own, whenever the parties choose to resort to our courts for redress. Of course the rule must be applied, if applied at all, as well when it operates against foreign ships as when it operates in their favor.

English cases have been cited to show that the courts of that country hold that their statutes prior to 1862, which in generality of terms were similar to our own, did not apply to foreign ships. See *The Nostra Signora de los Dolores*, 1 Dod. 290; *The Carl Johan*, cited in *The Dundee*, 1 Hagg. Adm. 109, 113; *The Girolamo*, 3 id. 169, 186; *The Zollverein*, 1 Swa. 96; *Cope v. Doherty*, 4 Kay & J. 367; s. c. 2 De G. & J. 614; *The General Iron Screw Collier Co. v. Schurmanns*, 1 John. & H. 180; *The Wild Ranger*, 1 Lush. 553. We have examined these cases. So far as they stand on general grounds of argument, the most important consideration seems to be this, that the British legislature cannot be supposed to have intended to prescribe regulations to bind the subjects of foreign States, or to make for them a law of the high sea; and that if it had so intended, it could not have done it. This is very true. No nation has any such right. Each nation, however, may declare what it will accept and, by its courts, enforce as the law of the sea, when parties choose to resort to its forum for redress. And no persons subject to its jurisdiction, or seeking justice in

its courts, can complain of the determination of their rights by that law, unless they can propound some other law by which they ought to be judged; and this they cannot do except where both parties belong to the same foreign nation; in which case, it is true, they may well claim to have their controversy settled by their own law. Perhaps a like claim might be made where the parties belong to different nations having the same system of law. But where they belong to the country in whose forum the litigation is instituted, or to different countries having different systems of law, the court will administer the maritime law as accepted and used by its own sovereignty.

The English courts say that, as foreigners are not subject to their law, nor entitled to its benefits, they will resort to the general law of general liability when foreigners are litigants before them. Where do they find such general law? In the law of nature? or the civil or common law? Is not the maritime law, as their own legislature or national authority has adopted it, as imperative as either of these? Does it not, in the British judicial conscience, stand for the law of nature, or general justice? As for the civil and common laws, they are only municipal laws where they have the force of laws at all. The better grounds for the English decisions seem to be the peculiar terms of the acts of Parliament on the subject, and the supposed policy of those acts, as being intended for the encouragement of the British marine. From these considerations, as grounds of construction, the conclusion may have been properly deduced that the law was intended to be confined to British ships. The question, it is true, has ceased to be of practical importance in England, since the act of 1862 (25 & 26 Vict., c. 63), by which the owners of any ship, British or foreign, are not to be answerable, without their actual fault or privity, for any loss or damage to person or property, to an amount exceeding £15 per ton of the ship's registered tonnage, or its equivalent in case of foreign ships. But the former English decisions are thought to have a bearing on our law, because the acts of Parliament to which they related, in their principal clauses, were conceived in the same broad and general terms as our act of Congress. Some of the clauses of the British acts, however, relating to registered ton-

nage and other particulars, admitted only a special application to British ships; and perhaps these clauses did require a restricted construction of the whole acts to such ships.

But there is no demand for such a narrow construction of our statute, at least of that part of it which prescribes the general rule of limited responsibility of ship-owners. And public policy, in our view, requires that the rules of the maritime law as accepted by the United States should apply to all alike, as far as it can properly be done. If there are any specific provisions of our law which cannot be applied to foreigners, or foreign ships, they are not such as interfere with the operation of the general rule of limited responsibility. That rule, and the mode of enforcing it, are equally applicable to all. They are not restricted by the terms of the statute to any nationality or domicile. We think they should not be restricted by construction. Our opinion, therefore, is that in this case the National Steamship Company was entitled to the benefit of the law of limited responsibility.

But it is objected that the appellants did not properly, and in due time, claim the benefit of the law. Under this head it is strenuously contended that the appellants did not comply with the rules of this court adopted in December Term, 1871. Without adverting to the fact that these rules were not in existence until long after this litigation had been pending, we may say, once for all, that they were not intended to restrict parties claiming the benefit of the law, but to aid them. Some form of proceeding was necessary to enable ship-owners to bring into concourse the various parties claiming damages against them for injuries sustained by mishaps to the ship or cargo, where they were entitled, or conceived themselves entitled, to the law of limited responsibility, and where they were subjected or liable to actions for damages at the suit of the parties thus injured. The rules referred to were adopted for the purpose of formulating a proceeding that would give full protection to the ship-owners in such a case. They were not intended to prevent them from availing themselves of any other remedy or process which the law itself might entitle them to adopt. They were not intended to prevent a defence by way of answer to a libel, or plea to an action, if the ship-owners should deem

such a mode of pleading adequate to their protection. It is obvious that in a case like the present, where all the parties injured are represented as libellants or intervenors in the cause, an answer setting up the defence of limited responsibility is fully adequate to give the ship-owners all the protection which they need.

But it is objected that they did not follow the statute by giving up and conveying to a trustee the strippings of the wreck and the pending freight. It is sufficient to say that the law does not require this. It contains two distinct and independent provisions on the subject. One is, that the ship-owners shall be liable only to the value of the ship and freight; the other is, that they may be discharged altogether by surrendering the ship and freight. If they failed to avail themselves of the latter, they are still entitled to the benefit of the former kind of relief. The primary enactment, in sect. 4283, Rev. Stat., is, that the liability of the owner for any loss or damage, without his privity or knowledge, shall in no case exceed the amount or value of his interest in the vessel and her freight then pending. Two modes for carrying out this law are then prescribed, one in sect. 4284, and the other in sect. 4285. By sect. 4284, a *pro rata* recovery against the ship-owner is given to the various parties injured "in proportion to their respective losses;" and it is added: "for that purpose the freighters and owners of the property, and the owner of the vessel, or any of them, may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner of the vessel may be liable, among the parties entitled thereto."

The other mode of attaining the benefit of the law is prescribed by sect. 4285, which declares that "it shall be deemed a sufficient compliance on the part of such owner, with the requirements of this title, if he shall transfer his interest in such vessel and freight, for the benefit of such claimants, to a trustee, to be appointed by any court of competent jurisdiction, &c., from and after which transfer all claims and proceedings against the owner shall cease." This last proceeding the respondents did not see fit to adopt; but that does not deprive them of the benefit of the preceding section.

As to the form of proceeding necessary to give the respon-

dents the benefit of sect. 4254, which declares that either party " may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner of the vessel may be liable," what more " appropriate proceeding " could be taken for this purpose, where all the parties are before a court of admiralty, and where the ship-owners plead their exemption under the statute, than to give a decree against them for the amount of their liability, and to distribute the sum amongst the parties entitled to it?

It seems to us that no additional rules are necessary to attain the object of the law in the case. It is plain enough to execute itself. If there are parties, not represented in the suit, who have claims for damages, it is the respondents' fault for not bringing them in, as they might have done after the rules of 1871 were adopted, by pursuing the remedy pointed out in those rules. But as to the actual libellants and intervenors in the suit, there is no reason in the world why the respondents should not be decreed to pay the value of the ship's strippings and remnants into court, nor why such amount should not be distributed *pro rata* amongst the claimants.

We think that this should have been done. If any further inquiries are necessary to be made, in order to ascertain the proper amount to be paid by the respondents, as depending upon the value of the articles saved, including freight or passage money realized, the court below can institute them in a proper way.

The question raised as to the rule of damages which should be adopted, in estimating the actual loss of the owners of the guano, was properly decided by the Circuit Court. The rule is, the prime cost or market value of the cargo at the place of shipment, with all charges of lading and transportation, including insurance and interest, but without any allowance for anticipated profits. When, as in this case, the goods have no ascertainable market value at the place of shipment, the guano being a natural deposit owned by the Peruvian government, indirect means must be resorted to for the purpose of ascertaining the real value at that place. The Circuit Court had the evidence of an experienced merchant on this subject, who based his estimate upon the price for which the goods were

usually sold in New York, with a fair deduction for profits and expenses of every kind. Under the circumstances of the case we do not see that any juster method could have been adopted. The rate of interest allowed, six per cent per annum, was the proper rate in such a case. See *The Vaughan and Telegraph*, 14 Wall. 258; *Murray* v. *Charming Betsey*, 2 Cranch, 64; *The Anna Maria*, 2 Wheat. 327; *The Amiable Nancy*, 3 id. 546; *Smith* v. *Condry*, 1 How. 28; *Williamson* v. *Barrett*, 13 id. 101.

In conclusion, our decision is, that as no error has been shown in any part of the decree below except on the question of limited responsibility, the same is in all respects affirmed with that exception; and for the error in that respect the decree of the Circuit Court must be reversed so far as it condemns the respondents to pay the whole amount of damage sustained by the libellants and intervenors; and the cause must be remanded with instructions to modify the decree and take such further proceedings as may be necessary to carry out the principles laid down in this opinion.

As to the costs of the litigation up to the time the appeal was taken to this court, the decree of the Circuit Court will not be disturbed, inasmuch as the respondents did not place themselves alone on the defence of limited responsibility, but contested the question of fault and any liability whatever, which was found against them.

As to the costs of this appeal, we think that no costs should be decreed to either party against the other. The question before the Circuit Court was a new one, upon which there was wide room for difference of opinion; and neither court nor parties had any precedents to guide or direct them as to the mode of proceeding. Therefore each party will be decreed to pay their own costs on this appeal.

MR. JUSTICE MATTHEWS and MR. JUSTICE GRAY did not sit in this case, nor take any part in deciding it.