## BONSALEM v. BYRON S. S. CO., Limited.
### No. 10536.

District Court, E. D. New York.
July 3, 1930.

Jesse L. Rosenberg, of New York City, for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, for respondent.

BYERS, District Judge.

This is an admiralty proceeding in personam, involving the following circumstances:

The libelant, a native of Algiers and being in this country, was employed as fireman on the steamship Lord Guilford, leaving the port of New York on or about December 14, 1923; the libelant had signed articles for this voyage in the office of the British consul at the port of New York, the ship being of British registry and ownership; that is to say, she was owned by the Bryon Steamship Company, Limited, and the ownership has so continued.

The voyage involved was apparently to Mediterranean ports, one of the ports of call being Palermo, Italy.

On or about January 10, 1924, while the ship was in that port, the libelant testified that towards the close of the day, at about 5:30 p. m., he learned from a fellow seaman that wages were being paid, and he thereupon spoke to the chief steward and asked to be directed to the chief mate, as he says, for the purpose of receiving his wages.

The chief steward, for some undisclosed reason, struck the libelant with a broom and an altercation followed, which was quickly participated in by the captain, the chief mate, the engineer, and other officers of the ship. The testimony is that the captain struck and kicked the libelant, fracturing his nose, knocking out two of his teeth, and inflicting cuts and lacerations upon the libelant, and finally handcuffing him.

The ship must have been lying at or near

a pier, because the libelant testifies that a watchman, whom he describes as being a kind of policeman, boarded the ship and interceded for him, and spoke to the captain, and then took the libelant to the forecastle and left him there, and shortly the chief mate removed the libelant's handcuffs while he was still in the forecastle.

One of the crew apparently took the libelant to a hospital, where he received treatment, and, on the following day, the libelant called at the office of a consul, but the nationality of the latter official is not disclosed. The libelant says that that official said that he was not a general consul, and told him that it would be necessary to see a consul of that rank.

The libelant returned to the ship, and apparently the next port of call was Piræus.

He testifies that he called upon the general consul in that city, thus:

"After I see the General Consul, he want me make friends with the captain, want him give the money, he say, I will give you money for signing my name.

"Q. All right; then what? A. I do not want to sign my name. After the captain goes away, he leave the ship.

"Q. The captain left the ship? A. The captain leave the ship, and the officers.

"Q. The captain and the officers left the ship? A. Yes, sir. The chief mate stay on the ship."

Apparently nothing happened for two or three days, when another crew arrived and the general consul told the libelant to go to Constantinople—"they have a Consul there better." He did not see a consul in Constantinople, but the ship apparently called at a port in Roumania, where a consul came aboard the ship, and the libelant testifies as follows: "He said, Now this is all finished, the captain is gone away. The Consul at Roumania want to give me money." The libelant testifies that he did not take any money, and he did not sign his name.

The ship later returned to Piræus, and the other members of the crew were paid off by the consul, but this libelant did not take any money, because he did not want to sign his name; at that port, he was transferred to another ship of the same line, namely, the Byron, on which he returned as a fireman to New York and received a certificate of discharge bearing the stamp of the British consulate general, and, in the blank space headed "Copy of Report of Character," appear the words "Very Good," as to both ability and general conduct.

The date of departure from Piræus on the Byron was February 21, 1924, but the date of discharge does not appear from the certificate of discharge, which was apparently an oversight in the office of the British consulate general in the port of New York.

After arrival at the latter place, the libelant was paid off at the office of the consul; namely, he received his wages for both ships.

He testifies that he asked the consul for advice as to what he should do about the personal injuries that he had suffered, and was referred to the general consul, and, in the office of the latter, he was advised to go to England, thus:

"Q. What did he tell you to do? A. Tell me go to London, go to England. Three times I have been there. After I have no more money I got a ship. I take ship, make one trip to Australia."

The facts have been recited somewhat in detail, because the authenticity of the libelant's claim depends in large measure upon his conduct in seeking redress for his injuries at or about the time that they occurred.

His story is corroborated, as to the fact that the captain left the ship Lord Guilford in Piræus during the first voyage referred to.

In the answers to the interrogatories and cross-interrogatories made by the secretary of the respondent company, whose deposition was taken in London on January 16, 1930, he gives the name of the master on January 10, 1924, as G. Chazapis, but says that he does not know the name of the deck officers of that steamship on that date, and that he does not know their present whereabouts, because "they were relieved in Piræus in April, 1924, and we have absolutely no trace of them since."

From the same source, it appears that the ship was purchased by the respondent in May, 1923, from a Grecian firm, and it may be inferred that the officers of the ship in January, 1924, were Greeks.

Also the inference is permissible that the various interviews with consuls, testified to by the libelant, may not be entirely unrelated to the fact that the captain and several of the officers were relieved from duty, as stated.

The libel herein was verified on July 27, 1927, and the respondent urges that the libelant has been guilty of such laches that his cause should be dismissed.

Under the circumstances of this case, that view will not be taken. The libelant was

absent from the city of New York between the date of his return in 1924 on the steamship Byron and the institution of this cause, a matter of over twenty months; in March, 1926, about two years after the occurrence in question, he instituted civil action against the National Steam Navigation Company, Limited, and the Byron Steamship Company, Limited, in the Southern District of New York, by the service of a summons and complaint on the first-named defendant, which action was abandoned, apparently because of the fact that the first defendant therein named was not in truth the general agent of the Byron Steamship Company, Limited, and did not own and had not leased or chartered the Steamship Lord Guilford as alleged in that complaint.

The fact, that the captain and several of the other officers were relieved, as above stated, in April, 1924, in a Grecian port, indicates that, from and after that date, they were not available as witnesses for the respondent and therefore the latter was not placed at a disadvantage in securing their testimony by reason of the fact that this cause was not instituted until 1927; it would seem as though precautions could have been taken by the respondent, between January, 1924, and April, 1924, to have procured the names and addresses of some witnesses to the occurrence in Palermo as recited by the libelant, particularly as the libelant testifies that, following his interview in New York at the office of the consul general, he wrote a letter to the Board of Trade in London which was never returned to him and which contained, as he says, a statement of facts concerning his claim for injuries received. In other words, it is difficult to avoid the belief that, in some manner, the respondent company was apprized, during the early part of 1924, of the incidents in question, and had an opportunity to fortify itself with the testimony of some person or persons concerning the incidents of which the libelant complains.

■ It is next urged on behalf of the respondent that the libelant's cause cannot prevail because he has not assumed the burden of proving that, under British law or under Italian law, he is entitled to a recovery.

The libel contains no allegations concerning the law of either of those countries, and thus the libelant did not assume the burden of proof in that behalf. The rule of decision on this subject contained in The Ubbergen (D. C.) 30 F.(2d) 951, 952, is binding upon this court in this respect. That was a deci-

sion by Judge Campbell in which a mess boy who suffered injuries as the result of unseaworthiness on the part of a ship did not allege that the ship was a foreign vessel, nor did he allege or prove the law of any foreign country as controlling his suit. The claimant in that case alleged that the libelant was a citizen of the Netherlands, and that the steamship was a vessel of Dutch registry, and that the Dutch law applied, and that thereunder the libelant was barred from maintaining his action; the claimant offered no evidence in support of those allegations. The court adopts the rule announced in The Scotland, 105 U. S. 24, 26 L. Ed. 1001, and quotes from that opinion as follows: "Hence, if a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it were shown what that law was. If not shown, we would apply our own law to the case."

Judge Campbell's opinion continues as follows: "The burden of proving the law of a foreign jurisdiction is upon him who asserts or relies on it. Kuhnhold v. Compagnie Generale Transatlantique (D. C.) 251 F. 387."

■ In this case, the respondent asserts in its answer, as a separate defense, that the Lord Guilford was a British vessel, and that the libelant was employed under a British contract and thereby subjected himself to the laws of Great Britain and Ireland and that the law applicable to this case is the law of Great Britain and Ireland. The respondent, however, has offered no proof in this case whatever, either as to the facts or as to the law which it claims controls the rights of the libelant.

The rule adopted by Judge Campbell is similar to that applied in The Hanna Nielsen (D. C.) 25 F.(2d) 984, 988, where the court says, under somewhat similar circumstances as to the nationality of the libelant and the ship on which he received the injury: "Requiring claimant, rather than libelant, to plead and prove the law of Norway, if different from that of the United States, is not unreasonable. Exceptions will be overruled."

In view, therefore, of the failure of the respondent in this case to prove the law of Great Britain, this case will be decided according to the law of the United States.

■ The right of a seaman to recover damages for assault committed by a subordinate

446

officer who acts within the general scope and line of his employment is declared in the case of Cain v. Alpha S. S. Corporation et al., 35 F.(2d) 717, 722.[1] This is a decision by the Circuit Court of Appeals in the Second Circuit, dated August 20, 1929. In that case, the court examined the subject with great care, and announced its conclusion in the following language: "While we recognize that the question is not free from doubt, we hold that the shipowner is liable for the willful assault of a subordinate officer acting as such in the ship's business. The denial of the motions to dismiss the complaint was, therefore, not error."

The testimony in this case is that the libelant was assaulted by the master and some of the other officers, and, as that testimony is not contradicted, it must be accepted as true.

With regard to the nature of the libelant's injuries, it is obvious that they were permanent in character, as is stated by a doctor who made an examination of the libelant and testified as a witness at the trial. The libelant's nose was fractured, and, as a result of an imperfect union of the involved bones, the breathing is obstructed. "The air cannot get into his nose on account of the deviated condition of the septum. The air goes in, and has to go through a right angle to get in, and there it strikes the fragments where bad union occurred. It cannot go to the back of his throat. It is deviated to the side. It cannot pass to his nasal thorax on account of the deviation." An operation would relieve this condition.

It is obvious that the libelant underwent pain and suffering, and he had to pay a small sum for attention at the hospital in Palermo, and it is adjudged that he recover from the respondent the sum of $400, with interest from July 27, 1927, together with costs, and a decree to that effect may be settled on three days' notice.

---

[1] Affirmed 281 U. S. 642, 50 S. Ct. 443, 74 L. Ed. 1086.