416 F.Supp. 371 (1976)
Complaint of TA CHI NAVIGATION (PANAMA) CORP. S. A., as owner of the S/S EURYPYLUS for exoneration from or limitation of liability.
CAROLINA FLORAL IMPORT, INC., et al., Plaintiffs,
v.
M. V. EURYPYLUS, her engines, boilers, etc., et al., Defendants.
Nos. 75 Civ. 5994, 75 Civ. 5768 (CHT).
United States District Court, S. D. New York.
May 20, 1976.
*372 Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for plaintiffs; Raymond P. Hayden, Caspar F. Ewig, New York City, of counsel.
Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City, for defendants and petitioner Ta Chi Navigation (Panama) Corp. S. A., Peter J. Zambito, Vincent J. Barra, New York City, of counsel.

MEMORANDUM
TENNEY, District Judge.
In accordance with the order entered herein on February 4, 1976, in Carolina Floral Import Inc., et al. v. M. V. EURYPYLUS, etc., 75 Civ. 5768, the attorneys for petitioner Ta Chi Navigation (Panama) Corp. S. A., as owner of the M. V. EURYPYLUS, for exoneration from or limitation of liability, and for cargo claimants, have agreed to submit the following question for determination in the above-captioned limitation proceeding (75 Civ. 5994):
1. Whether the United States Limitation of Liability Act, Sections 4283, 4284, 4285 and 4289 of the Revised Statutes of the United States (46 U.S.C.A. §§ 183-185, 188) or the law of the Republic of Panama, applies to the limitation proceeding and governs the items comprising the limitation fund herein.
(A) If the Court decides that United States law applies, irrespective of whether Panamanian law is substantive or procedural, then the Limitation Fund shall be fixed according to United States Limitation of Liability Act (46 U.S.C.A. § 183).
(B) If the Court determines that Panamanian law could apply, if substantive, then counsel have agreed to obtain pertinent testimony in Panama for later submission to the Court regarding the nature of a shipowner's exoneration from or the limitation of liability provided for in the Commercial Code of the Republic of Panama.
A brief statement of assumed facts may prove helpful before embarking on what, until now, were believed to be charted waters.
On or about October 25, 1975, there was received on board M. V. EURYPYLUS at the port of Kobe, Japan, various shipments which together with other cargo received on board at Hong Kong and Taiwan were destined for discharge and delivery at Cristobal C. Z., San Juan, Puerto Rico, and at various ports on the Gulf and east coasts of the United States, including Charleston, Philadelphia, Baltimore and New York. Thereafter, the vessel departed from Kobe with some 7,767 tons of general cargo shipped under 322 bills of lading. M. V. *373 EURYPYLUS was owned by Ta Chi Navigation (Panama) Corp. S. A. (hereinafter "Ta Chi Navigation").[1] The bills of lading were issued by Ta Peng Lines (or by Ta Peng Steamship Co., Ltd.). Both corporations conduct business in New York City through an agent, Transnational Maritime, Inc., 25 Broadway, New York City.
On November 10, 1975 the vessel sustained serious damage as the result of an explosion and fire in her engine room, the fire spreading rapidly to the after three cargo holds. After unsuccessfully attempting to control the fire, the crew abandoned the vessel then lying some 700 miles south of Los Angeles and on the high seas. Thereafter the vessel was delivered to Los Angeles, California, by salvors.
On November 17, 1975, the first claim for failure to deliver cargo was filed in this Court as an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. An amended and supplemental complaint was filed in that action on January 22, 1976 adding more than 50 additional cargo claimants as party plaintiffs, consisting for the most part of United States corporations. Also added as party plaintiffs were numerous underwriters who "by virtue of policies of insurance issued by them to shippers or consignees or some of the cargo-plaintiffs hereinbefore identified, are obligated to pay plaintiffs the amount of their losses pursuant to the terms and conditions of said policies of insurance and the underwriter-plaintiffs have already issued salvage guarantees for the discharged cargoes insured under said policies." (Amended and Supplemental Complaint, 75 Civ. 5768, ¶ SIXTH).
Following the filing, on November 17, 1975, of the initial claim against the shipowner Ta Chi Navigation, the shipowner commenced the subject limitation proceeding by filing a complaint seeking exoneration from or limitation of liability pursuant to the United States Limitation of Liability Act, 46 U.S.C. §§ 183-185, 188. A dispute having arisen as to the law to be applied in determining "the amount or value of the interest of [the] owner in the vessel", this Court, on February 4, 1976, ordered Ta Chi Navigation in 75 Civ. 5768, the pending suit by the cargo claimants, to post surety in the pending limitation proceeding, 75 Civ. 5994, in the sum of $268,246.30, that being the value of M. V. EURYPYLUS after the casualty, plus her pending freight on the voyage concerned, less salvage liens arising from the casualty, but without prejudice to plaintiffs' right to demand additional security in the limitation proceeding in the event: (1) that the Court determine that the salvage liens or any part thereof should be added to the present limitation funds, thereby increasing same to a sum not exceeding $624,246.30, pursuant to 46 U.S.C. § 183;[2] and/or (2) that the limitation fund is determined to be governed by some law other than as provided for by the said United States Limitation of Liability Act. In connection with the determination of the governing law as to the limitation fund, plaintiff cargo-claimants assert that the rights of the parties are governed and controlled by the law of the flag of M. V. EURYPYLUS, i. e., the laws of the Republic of Panama and, we assume, specifically by Sections 1078, 1079 and 1093 of the Commercial Code of the Republic of Panama. Petition of Chadade Steamship Co. (Yarmouth Castle), 266 F.Supp. 517 (S.D.Fla. 1967) (hereinafter "Chadade"). Cargo claimants' attraction to Chadade is due to the holding therein that under similar circumstances Panamanian law was applicable in determining the "amount or interest of the owner in the vessel," and that under such law the court in Chadade determined *374 that hull insurance, and protection and indemnity insurance, up to the amount necessary to cover the value of the claims pleaded or the face value of such insurance, whichever sum was smaller, was to be included in determining the owner's interest.
No claim is made by any of the parties hereto that hull or liability insurance is includable under 46 U.S.C. § 183, except insofar as the claim is made inferentially that in a proceeding under Section 183 the value of the res to be surrendered or for which surety may be given shall in the instant case be determined by the Panamanian definition of that res, which definition states that "[t]he indemnization of the insurance is part of the patrimony of the vessel." Article 1078 of the Commercial Code of the Republic of Panama, quoted in Chadade, supra, 266 F.Supp. at 521. Indeed, under our law such insurance must be excluded. The City of Norwich, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134 (1886); Pettus v. Jones & Laughlin Steel Corporation, 322 F.Supp. 1078, 1080-81 (W.D.Pa.1971); In re Pacific Inland Navigation Company, 263 F.Supp. 915, 919 (D.Hawaii 1967); In re Sheridan's Petition, 226 F.Supp. 136, 140 (S.D.N.Y.1964); Gilmore and Black, The Law of Admiralty, 907-908 (2d ed. 1975). See also Maryland Casualty Co. v. Cushing, 347 U.S. 409, 419, 74 S.Ct. 608, 613, 98 L.Ed. 806, 816 (1954).

DISCUSSION
Section 183 is the very heart of the Limitation Act and subsection (a), containing the general provision, has been virtually unchanged since the Act was initially passed in 1851. It now reads as follows:
"The liability of the owner of any vessel, whether American or Foreign,[3] for any embezzlement, loss, or destruction by any person of any property, goods or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section,[4] exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." (The italicized words were added by amendment in 1936).
The leading decision on the effect of foreign limitation statutes on actions brought by owners of foreign vessels in our courts under the United States Limitation of Liability Act is Oceanic Steam Navigation Company v. Mellor (The Titanic), 233 U.S. 718, 34 S.Ct. 754, 58 L.Ed. 1171 (1914) (hereinafter "The Titanic"). Before discussing The Titanic, reference should be made to two earlier cases decided by the Supreme Court, i. e., The Scotland, 105 U.S. 24, 26 L.Ed. 1001 (1881), and La Bourgogne, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973 (1908), both of which involved collisions on the high seas between foreign flag vessels.
The Scotland, supra, 105 U.S. 24, 26 L.Ed. 1001, involved a collision in 1866 on the high seas between the British steamship, Scotland, and an American ship. The American ship sank immediately with all its cargo. The British vessel attempted to return to New York but also sank and became a total loss with the exception of some ship's material salvaged before she went down. Libels in personam were filed in the District Court for the Eastern District of New York against the British shipowner by the owners of the American ship, cargo interests, and others. The District Court rendered a decree in favor of libellants and denied the defense of the limited liability law, a similar *375 decision being reached on trial in the Circuit Court. The principal question on the appeal to the Supreme Court was whether the British shipowner was entitled to the benefit of limited liability either under the general maritime law or under the United States Limitation of Liability Act. The libellants contended that, in addition to procedural deficiencies on the part of the owner, the general maritime law on the subject (if there be any) was not in force in the United States and the benefit of the United States statute could not be claimed by foreign vessels. After declaring that limitation of liability is now part of United States' maritime law, the Supreme Court noted that, nevertheless, it was statute law and was to be interpreted and administered as such. The question was, did the United States statute govern the case? In holding that it did apply, Mr. Justice Bradley, in writing for the Court stated:
"In administering justice between parties it is essential to know by what law or code or system of laws, their mutual rights are to be determined. When they arise in a particular country or State, they are generally to be determined by the laws of that State. Those laws pervade all transactions which take place where they prevail, and give them their color and legal effect. Hence, if a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it were shown what that law was. If not shown, we would apply our own law to the case. In the French or Dutch tribunals they would do the same. But, if a collision occurs on the high seas, where the law of no particular State has exclusive force, but all are equal, any forum called upon to settle the rights of the parties would, prima facie, determine them by its own law as presumptively expressing the rules of justice; but if the contesting vessels belonged to the same foreign nation, the court would assume that they were subject to the law of their Nation carried under their common flag, and would determine the controversy accordingly. If they belonged to different Nations, having different laws, since it would be unjust to apply the laws of either to the exclusion of the other, the law of the forum, that is, the maritime law as received and practiced therein, would properly furnish the rule of decision. In all other cases, each Nation will also administer justice according to its own laws." Id. at 29-30, 26 L.Ed. at 1003 (emphasis added).
* * * * * *
"Each Nation, however, may declare what it will accept and, by its courts, enforce as the law of the sea, when parties choose to resort to its forum for redress. And no persons subject to its jurisdiction, or seeking justice in its courts, can complain of the determination of their rights by that law, unless they can propound some other law by which they ought to be judged; and this they cannot do except where both parties belong to the same foreign Nation; in which case, it is true, they may well claim to have their controversy settled by their own law. Perhaps a like claim might be made where the parties belong to different Nations having the same system of law. But where they belong to the country in whose forum the litigation is instituted, or to different countries having different systems of law, the court will administer the maritime law as accepted and used by its own sovereignty." Id. at 31-32, 26 L.Ed. at 1004 (emphasis added).
* * * * * *
"[P]ublic policy, in our view, requires that the rules of the maritime law as accepted by the United States should apply to all alike, as far as it can properly be done. If there are any specific provisions of our law which cannot be applied to foreigners, or foreign ships, they are not such as interfere with the operation of the general rule of limited responsibility. That rule and the mode of enforcing it are *376 equally applicable to all. They are not restricted by the terms of the statute to any nationality or domicile. We think they should not be restricted by construction. Our opinion, therefore, is that in this case the National Steamship Company was entitled to the benefit of the law of limited responsibility." Id. at 33, 26 L.Ed. at 1004.
La Bourgogne, supra, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed.2d 973, involved a collision on the high seas, in 1898, between a British ship and a French ship, the latter vessel sinking with heavy loss of life and property. Numerous suits in admiralty and actions at law were brought in various federal and state courts against the French vessel, or her owners, to recover damages for loss of life, baggage, and personal effects. Thereafter, the owner of the French vessel petitioned in this district for limitation liability. No question appears to have been raised in the lower courts as to the applicability of the United States limitation statute. The Supreme Court, in an opinion by Mr. Justice White, observed that it had been "settled in The Scotland, 105 U.S. 24, 26 L.Ed. 1001, that a foreign ship is entitled to obtain in the courts of the United States the benefit of the law for the limitation of liability of shipowners." Id. at 115, 28 S.Ct. at 670, 52 L.Ed. at 983. However, in the Supreme Court it was argued that the "fault" of the French vessel should be determined by French law rather than by the law of the forum. After quoting from Mr. Justice Bradley's opinion in The Scotland, supra, 105 U.S. at 29-30, 26 L.Ed. at 1003, relating to collisions on the high seas, as quoted above, Mr. Justice White concluded that
"we are of the opinion that we must decide the case before us by the international rule as interpreted in the courts of the United States, and not by the practice under that rule prevailing in the French courts, if there be a difference between the two countries. The petitioner is here seeking the benefits conferred by a statute of the United States, which it could not enjoy under the general maritime law. Strictly speaking, the application for a limitation of liability is in effect a concession that liability exists, but, because of the absence of privity or knowledge, the benefits of the statute should be awarded." La Bourgogne, supra, 210 U.S. at 116, 28 S.Ct. at 671, 52 L.Ed. at 984 (emphasis added).
As has already been noted, The Scotland and La Bourgogne involved collisions between ships on the high seas. The Titanic, supra, 233 U.S. 718, 34 S.Ct. 754, 58 L.Ed. 1171, involved a British ship sunk in a collision with an iceberg on the high seas with total loss of the vessel and heavy loss of life, cargo, and other property. After a number of actions to recover for loss of life and personal injuries had been brought against the British shipowner in federal and state courts, the shipowner filed a petition for limitation of its liability under the United States Limitation of Liability Act. Claimants, both English and American, argued that English limitation law, which provided a fund for recovery even though the ship was lost, should apply. The Second Circuit Court of Appeals certified three questions to the Supreme Court as follows:
"A. Whether, in the case of a disaster upon the high seas, where (1) only a single vessel of British nationality is concerned and there are claimants of many different nationalities; and where (2) there is nothing before the court to show what, if any, is the law of the foreign country to which the vessel belongs, touching the owner's liability for such disaster,  such owner can maintain a proceeding under §§ 4283-4285 U.S. Revised Statutes and the 54th and 56th Rules in Admiralty?
"B. Whether if, in such a case it appears that the law of the foreign country to which the vessel belongs makes provision for the limitation of the vessel owner's liability, upon terms and conditions different from those prescribed in the statutes of this country, the owner of such foreign vessel can maintain a proceeding in the courts of the United States, under said statutes and rules?

*377 "In the event of the answer to question B being in the affirmative,
"C. Will the courts of the United States in such proceeding enforce the law of the United States or of the foreign country in respect to the amount of such owner's liability?" Id. at 731, 34 S.Ct. at 755, 58 L.Ed. at 1179 (emphasis added).
The Supreme Court, in an opinion by Mr. Justice Holmes, answered both questions A and B in the affirmative and with respect to question C declared that our courts would enforce the law of the United States and not that of the foreign country. The opinion of Mr. Justice Holmes is clear and to the point.
"It is true that the act of Congress does not control or profess to control the conduct of a British ship on the high seas. See American Banana Co. v. United Fruit Co., 213 U.S. 347, 356 [53 L.Ed. 826, 29 S.Ct. 511.] It is true that the foundation for a recovery upon a British tort is an obligation created by British law. But it also is true that the laws of the forum may decline altogether to enforce that obligation on the ground that it is contrary to the domestic policy, or may decline to enforce it except within such limits as it may impose. Cuba Railroad Co. v. Crosby, 222 U.S. 473, 478, 480 [56 L.Ed. 274, 32 S.Ct. 132.] Dicey, Conflict of Laws, 2d ed., 647. It is competent therefore for Congress to enact that in certain matters belonging to admiralty jurisdiction parties resorting to our courts shall recover only to such extent or in such way as it may mark out. Butler v. Boston & Savannah Steamship Co., 130 U.S. 527 [32 L.Ed. 1017, 9 S.Ct. 612.] The question is not whether the owner of the Titanic by this proceeding can require all claimants to come in and can cut down rights vested under English law, as against, for instance, Englishman living in England who do not appear. It is only whether those who do see fit to sue in this country are limited in their recovery irrespective of the English law. That they are so limited results in our opinion from the decisions of this court. For on what ground was the limitation of liability allowed in The Scotland or La Bourgogne? Not on their being subject to the act of Congress or any law of the United States in their conduct, but if not on that ground then it must have been because our statute permits a foreign vessel to limit its liability according to the act when sued in the United States. There may be some little uncertainty in the language of Mr. Justice Bradley in the earlier case. A slight suggestion that the statute is applied because of a vacuum,  the absence of any law properly governing the transaction. But it was no necessary part of his argument that people were to be made liable after the event by the mere choice of a forum; and if they were it would not be because of the act of Congress. That does not impose but only limits, the liability  a liability assumed already to exist on other grounds. The essential point was that the limitation might be applied to foreign ships if sued in this country although they were not subject to our substantive law." Id. at 732-33, 34 S.Ct. at 755-56, 58 L.Ed. at 1180 (emphasis added).
The decision in The Titanic was accepted law until 1949 when the Supreme Court decided Black Diamond Steamship Corp. v. Robert Stewart & Sons, Ltd. (The Norwalk Victory), 336 U.S. 386, 69 S.Ct. 622, 93 L.Ed. 754 (1949) (hereinafter "The Norwalk Victory"), and still is the controlling law in the instant case.
Briefly, The Norwalk Victory involved a collision between an American vessel and a British steamer in the Schelde River, within the territorial waters of Belgium, which resulted in the sinking of the British vessel with loss or damage to its cargo. The cargo owners sued the owners of the American vessel in federal court whereupon the owners petitioned for limitation under 46 U.S.C. § 185, but limited their tender of security to the amount of $325,000 under the alleged applicability of the Belgian statute, rather than $1,000,000, the value of the ship as determined by the provisions of Section 185. The owner's petition for limitation was dismissed by the district judge and his decree *378 affirmed by the Court of Appeals for this Circuit because the amount of the security was not sufficient under the United States Limitation of Liability statute. In a 5-4 decision, the Supreme Court held that the shipowner should be given an opportunity to submit proof as to the nature of Belgian statute with particular reference to whether it was a procedural rule or a substantive law, and that if the latter was shown to be the case the shipowner should have the benefit of the Belgian law. The case was reversed and remanded with the suggestion that the shipowners be required to post a bond in the amount of $1,000,000 (the value of the vessel) to preserve the status quo. Unfortunately, Mr. Justice Frankfurter's citation to The Titanic in The Norwalk Victory, supra, 336 U.S. at 395, 69 S.Ct. at 627, 93 L.Ed. at 768, is somewhat ambiguous:
"Having decided that the case must be remanded because the petition was improperly dismissed, we turn to the question whether there are any circumstances under which the Belgian limitation would be enforceable by our courts. On this point we agree with the Court of Appealsand disagree with the District Court  that if, indeed, the Belgian limitation attaches to the right, then nothing in The Titanic, 233 U.S. 718 [34 S.Ct. 754, 58 L.Ed. 1171], stands in the way of observing that limitation. The Court in that case was dealing with `a liability assumed already to exist on other grounds.' Id. at 733 [34 S.Ct. 754, 58 L.Ed. 1171]." Id.

The final sentence quoted above is perhaps misleading, and the quotation from Mr. Justice Holmes' opinion may have been taken out of context. In describing the United States Limitation of Liability Act, he noted that the Act itself does not impose, but only limits the liability  "a liability assumed [by the Act] already to exist on other grounds [other than by virtue of the Act]." Id. This is true in any case brought under the Limitation of Liability Act and does not distinguish The Titanic from any other such case. The following sentence in Mr. Justice Holmes' opinion makes it very clear that the limitation under the United States' statute might be applied to foreign ships if sued in the United States although they were not subject to United States' substantive law, i. e., they were subject to foreign substantive law. Even were it to have affected The Titanic, which it did not, The Norwalk Victory is clearly distinguishable from the instant case involving, as it does, a disaster on the high seas rather than in territorial waters and one with entirely different issues involved. Furthermore, in this Circuit it seems clear that The Titanic doctrine is still good law. Kloeckner Reederei Und Kohlenhandel v. A/S Hakedal, 210 F.2d 754, 757 (2d Cir. 1954).[5]
And so we finally reach Chadade, supra, 266 F.Supp. 517, upon which the claimants in effect rest their case. Chadade involved the Panamanian-flag cruise ship Yarmouth Castle, which on November 13, 1965, burned and sank on the high seas with resultant death, injury and property claims totalling more than 59 million dollars. The shipowners filed a petition for limitation of and exoneration from liability on December 8, 1965, claiming the benefit of the United States Limitation of Liability *379 Act or "any applicable Convention or Foreign law" relating to limitation of liability. Id. at 519. The shipowner offered an interim stipulation for value in the sum of $33,000, and further offered to file such stipulation or other security as the court might fix, not to exceed $60.00 per ton, presumably to comply with Section 183(b) of the limitation statute relating to death or personal injury claims. By order of the court the shipowner amended the petition to claim the benefit of certain provisions of the Commercial Code of the Republic of Panama granting exoneration from or limitation of liability in the event it be determined that the rights of the parties were governed by such foreign law. The court discussed The Titanic and The Norwalk Victory, and concluded, as had the Second Circuit Court of Appeals, that the latter case had not overruled the former. However, it determined that the Panamanian law was substantive rather than procedural, and applied that law to fix the surety bond to be filed by the shipowner. This would appear to run contrary to the holding by Mr. Justice Holmes that the limitation under the United States Limitation of Liability Act might be applied to foreign ships if they are sued in the United States even though they were subject to foreign substantive law. Indeed the opinion in Chadade suggests that the foreign law will be applied as substantive if it sets higher limits of liability than does the United States Limitation of Liability Act. However, it would appear that only when the foreign substantive law sets lower limits will it affect the surety to be posted under the United States' statute. Significantly, the provisions of Section 183 state that the liability thereunder shall not exceed the amount or value of the interest of" the shipowner. In a proper case it can be less. The Norwalk Victory, supra, 336 U.S. 386, 69 S.Ct. 622, 93 L.Ed. 754. See also note 5, supra.
Chadade, like The Titanic, involved a foreign law which, it would appear, set higher limits of liability. It seems difficult to reconcile the different conclusions reached in the two cases, and since Chadade has apparently never been cited by any court, it certainly cannot be regarded as defining the law in this Circuit.
The learned Judge in Chadade suggested that if his analysis of The Titanic and The Norwalk Victory were not correct, The Titanic should be reexamined in the light of the conflict of laws "based upon a more realistic appraisal of world conditions and more responsive to the practicalities of modern maritime commerce." Chadade, supra, 266 F.Supp. at 523. This, however, is a legislative, rather than a judicial prerogative. There is nothing ambiguous about the statute.
Moreover, the instant controversy is not one which appeals to the conscience of the court. None of the claimants herein represent the interests of deceased seamen, and if Panamanian law grants a right of action for wrongful death on the high seas, they are free to sue in our courts outside the limitation proceeding. Death on the High Seas Act, 46 U.S.C. § 764; The Vestris, 53 F.2d 847, 853 (S.D.N.Y.1931).[6] The claimants, not the shipowner, selected the forum, and claimants may still have remedies available in the Republic of Panama, since any decree entered herein will have no extraterritorial effect. Petition of Bloomfield Steamship Company, 422 F.2d 728, 736 (2d Cir. 1970). In the final analysis, and as is so often the case, the Court is dealing in great part herein with the conflicting interests of insurance underwriters. If the shipowner's hull and liability insurance can be brought into the limitation fund, to that extent the insurers of the cargo claimants are relieved of their burden.
Accordingly, the Court holds that the United States Limitation of Liability Act, 46 U.S.C. §§ 183-185, 188, applies to the limitation proceeding and governs the *380 items comprising the limitation fund herein in the absence of any proof that the substantive law of the Republic of Panama would fix the shipowner's liability in a lesser amount than fixed under 46 U.S.C. § 183(a).
So ordered.
NOTES
[1] In an action by cargo claimants, not parties to the instant proceeding, the ownership of the vessel is alleged to be either Ta Peng Lines, Ta Chi Navigation Corp. S. A., or Compania Maritima San Basilio, S. A. I.T.A.D. Associates, Inc., et al. v. S. S. "EURYPYLUS", et al., 75 Civ. 6481.
[2] No request for such determination has been made in the instant proceeding, and accordingly the Court refrains from any such determination at this time.
[3] The Limitation Act had been held applicable to foreign vessels as early as 1881. The Scotland, 105 U.S. 24, 31, 26 L.Ed. 1001, 1003 (1881).
[4] The excepted cases provided for in subsection (b) are those involving loss of life or bodily injury, in which cases, where the limitation is insufficient to pay all losses in full, the portion applicable to the payment of claims for loss of life or bodily injury must be increased to an amount equal to $60 per ton of the vessel's tonnage.
[5] There would appear to be nothing inconsistent between the results reached in The Titanic and The Norwalk Victory. In The Titanic the amount recoverable under British law (The Merchants Shipping Act of 1894) was much greater than the limits set by § 183, whereas in The Norwalk Victory the amount recoverable under Belgian law was far less than the § 183 limitation. Accordingly, the question in The Titanic was whether, assuming the British law attached to the right, that right was subject to limitation as to those who sued to enforce it in our courts. The question in The Norwalk Victory related to the security to be given pursuant to § 185. If the Belgian law attached to the right, the liability of the shipowner would be less than, rather than being limited by, the amount fixed by the provisions of § 183. The majority opinion clearly indicated that if the District Court determined that Belgian law controlled, § 185 would be read in the light of § 183, and the surety would be allowed in the lesser amount to reflect the liability established by the foreign law. In other words, the United States Limitation statute cannot be interpreted as creating a greater liability than is established by foreign law, but only as limiting the foreign liability in United States courts.
[6] It is possible that Panamanian law does not grant such a cause of action, since no mention of § 764 of the Death on the High Seas Act was made in Chadade. The bulk of the claims were death claims which must have been asserted under § 761 of that Act and therefore subject to limitation unlike claims under § 764.